**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **NATIONAL OILWELL VARCO, L.P.,** | § | |
| **Plaintiff** | § | **CIVIL ACTION NO. 1:12-CV-00773** |
| | § | |
| **v.** | § | **Judge Sam Sparks** |
| | § | |
| **OMRON OILFIELD & MARINE, INC.,** | § | |
| **Defendant** | § | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISQUALIFY**

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     TEXAS DISCIPLINARY RULE OF PROFESSIONAL CONDUCT 1.09.......................6

III.    FACTS .............................................................................................................7

        A.      Wunder did No Work Relating to the '142 Patent Prior to Joining Raley & Bowick ..................................................................................................7

        B.      Wunder's Transfer to Raley & Bowick did not Risk Disclosure of Confidential Information or Otherwise Create a Conflict ....................................12

IV.     OMRON'S MOTION SHOULD BE DENIED ...............................................................17

        A.      Omron Bears a Heavy Burden to Prove Disqualification ......................................17

        B.      Rule 1.09(c) is the Only Relevant Portion of Rule 1.09, and It In No Way Allows Disqualification of Raley & Bowick .......................................................18

        C.      Even if Rules 1.09(a) and (b) Applied, Disqualification would be Improper Because Wunder Never Worked on a "Substantially Related Matter" for Omron ..................................................................................................22

                1.      Wunder testified that he never worked on any matter relating to the '142 Patent while at Osha Liang .......................................................23

                2.      Omron's declarations are not credible, and are completely trumped by Wunder's testimony .........................................................26

                3.      Omron's declarations fail to meet the Fifth Circuit's specificity requirement .........................................................................28

                4.      Wunder's involvement in *Canrig v. Omron* is not "substantially related" to this litigation...........................................................30

        D.      Omron Long Ago Waived Any Conflict that May Have Existed..........................31

        E.      All Rules of Reason and Justice Argue Against Disqualification ........................33

V.      Conclusion ..........................................................................................................37

# TABLE OF AUTHORITIES

## *Cases*

*Buck v. Palmer*, 381 S.W.3d 525, 528 (Tex. 2012) ....................................................33

*Canrig Drilling Technologies Ltd. v. Omron Oilfield & Marine, Inc. and Helmerich & Payne, Inc.* (Case No. 6:09-cv-414 in the E.D.TX) ................... *2, 7-8, 11, 13-14, 25-26, 30-31*

*Carbo Ceramics v. Norton-Alcoa Proppants*, 155 F.R.D. 158, 161 (N.D. Tex. 1994) .......... 33-35

*Conoco, Inc. v. Baskin*, 803 S.W.2d 416, 419 (Tex.App. – El Paso 1991) ...................................33

*Davidson v. Great Nat. Life Ins. Co.,* 737 S.W.2d 312, 313 (Tex.1987). ...................................27

*Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1029 (5th Cir.1981 ......................................................................................................... 28-29

*Echostar Commc'ns Corp.*, 448 F.3d 1294 (Fed. Cir. 2006)....................................................2, 11

*Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970) .................27

*Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466, 468 (Tex. 1994) ...................................33

*HECI Exploration Co. v. Clajon Gas Co.*, 843 S.W.2d 622, 628 – 29 (Tex. App. – Austin 1992)..............................................................................................................33

*HLP Properties, LLC, et al. v. Consolidated Edison Company of New York, Inc.*, 1:14-cv-01383-LGS, (S.D.N.Y., 10/16/14), Doc. 115, p. 4........................................36

*Hogue v. Kroger Store No. 107, 875 S.W.2d 477, 480* (Tex.App.—Houston [1st Dist.] 1994, writ denied) ....................................................................................27

*In re EPIC Holdings, Inc.,* 985 S.W.2d 41, 60 (Tex. 1998). ........................................................18

*In re Meador,* 968 S.W.2d 346, 350 (Tex.1998) (orig.proceeding) ..............................................37

*In re Nitla S.A. de C.V.,* 92 S.W.3d 419, 422 (Tex. 2002)............................................................17

*In re ProEducation Int'l, Inc.*, 587 F.3d 296, 299 – 300 (5th Cir. 2009) ....................................17

*In re Swanson*, 540 F.3d 1368, 1377 (Fed. Cir. 2008).................................................................31

*In re Texas Windstorm Ins. Ass'n*, 417 S.W.3d 119, 129 (Tex. App.—Houston [1st Dist.] 2013, no pet.) .................................................................................... 6, 17-18

*In Texas Employers' Insurance Ass'n v. Garza,* 308 S.W.2d 521, 527 (Tex.Civ.App.—Amarillo 1957, writ ref'd n.r.e) ....................................................................27

*Industrial Acc. Bd. of State of Tex. v. Spears,* 797 S.W.2d 55, 658 (Tex. 1990)..........................18

*McIntyre v. Ramirez,* 109 S.W.3d 741, 749-50 (Tex. 2003)...........................................................27

*McMahon v. Greenwood,* 108 S.W.3d 467 (Tex. App. – Houston [14ᵗʰ Dist.] 2003)..................15

*M-I LLC v. Stelly,* No. 4:09-cv-1552, 2010 U.S. Dist. LEXIS 52736, *3 (S.D. Tex. 2010) .........17

*OneBeacon Ins. Co. v. T. Wade Welch & Associates,* 2012 WL 393309, at *5 (S.D. Tex. 2012)...........................................................................................................................17

*Pollard v. Merkel,* 114 S.W.3d 695, 698 (Tex. App.—Dallas 2003, pet. denied)........................37

*Russell Stover Candies, Inc. v. Elmore,* 58 S.W.3d 154, 157 (Tex. App. 2001) ..........................27

*Ryland Group, Inc. v. Hood, et. al.,* 924 S.W.2d 120, 122 (1996) ................................................27

*Vaughan v. Walther,* 875 S.W.2d 690, 690 – 91 (Tex. 1994)........................................................33

## **<u>Statutes and Rules</u>**

35 U.S.C. § 284................................................................................................................................1

Texas Disciplinary Rule of Professional Conduct Rule 1.05 ............................................... 7, 18-20

Texas Disciplinary Rule of Professional Conduct Rule 1.09(a)........................................3, 18, 22

Texas Disciplinary Rule of Professional Conduct Rule 1.09(a)(1) ..............................................19

Texas Disciplinary Rule of Professional Conduct Rule 1.09(a)(3) .........................................3, 23

Texas Disciplinary Rule of Professional Conduct Rule 1.09(b)............................................18, 22

Texas Disciplinary Rule of Professional Conduct Rule 1.09(c)......................................3, 18, 22

Texas Disciplinary Rule of Professional Conduct Rule 1.10 ........................................................7

Texas Disciplinary Rule of Professional Conduct Rule 11 ..........................................................6

## **<u>Other</u>**

American Intellectual Property Law Association Report of Economic Survey .............................6

iv

National Oilwell Varco, L.P. ("NOV") files this Response to the Motion to Disqualify (Doc.No. 100) Raley & Bowick, L.L.P. ("Raley & Bowick") filed by Omron Oilfield & Marine, Inc. ("Omron").

## I.      INTRODUCTION

NOV is suing Omron for willful infringement of U.S. Patent No. 5,474,142 ("'142 Patent"). Omron offered one of NOV's employees a salary increase to come to work for Omron and design an automatic driller that looked and operated <u>exactly</u> like NOV's AutoDriller. Omron used its copycat automatic driller to steal the business of one of NOV's largest customers, making many millions of dollars in doing so. NOV's damages exceed $18 million dollars. The evidence shows that Omron willfully infringed NOV's '142 Patent, making Omron's potential liability up to three times this amount.[1]

In an effort to derail the train of this lawsuit, Omron filed a frivolous motion to disqualify Raley & Bowick. Omron's eleventh hour tactical maneuver is meant to:

- Deprive NOV of its fundamental right to counsel of its choice;

- Attempt to pressure NOV to settle by rendering hundreds of thousands of dollars of attorney work product meaningless and forcing NOV to incur hundreds of thousands of additional dollars in hiring new counsel;

- Delay NOV's recovery and justice; and

- Create tremendous prejudice against NOV by forcing it to abandon long-time counsel that has been successfully litigating the '142 Patent on its behalf in multiple cases around the country over a decade.

---

[1] Under 35 U.S.C. § 284, if the jury finds willful infringement, this Court has the discretion to triple the amount of any damage award.

1

Omron's motion is based on innuendo and completely disregards the evidence. Omron does not even attempt to allege actual prejudice. NOV and its counsel should be allowed to proceed to trial as scheduled.

In 2006, Omron's president Robert Bost hired John Osha of Osha Liang, L.L.P. ("Osha Liang) to write an opinion that the '142 Patent was invalid. In 2011, Bost hired another attorney with the same firm, Lee Huddleston, to update this opinion. Omron has now *produced* both of these opinions, and communications relating to these opinions, to support an "advice of counsel" defense to the willful infringement claim.[2] Omron's assertion of this defense *waives* all claimed confidences relating to these opinions, including the emails attached to Omron's Motion.[3]

While these validity opinions were being authored, Brian Wunder was a contract attorney at Osha Liang. He was one of several lawyers who represented Omron in an entirely different case, *Canrig Drilling Technologies Ltd. v. Omron Oilfield & Marine, Inc. and Helmerich & Payne, Inc.* (Case No. 6:09-cv-414 in the Eastern District of Texas)(hereinafter referred to as "*Canrig*."). *Canrig* involved a different patent, different tools, and a different opposing party. Wunder never analyzed the validity of NOV's '142 patent, and never considered whether Omron infringed it. To this day, he has never even seen the '142 patent.

On August 23, 2012, NOV sued Omron for infringing the '142 Patent. Raley & Bowick, whose lawyers have represented NOV regarding the '142 Patent over a decade, filed the complaint. Omron declined to hire Osha, Huddleston or Wunder to represent it in this case. Instead, Omron chose Matthew Lowrie from Massachusetts and Kimberly Dodd from Wisconsin.

---

[2] *Echostar Commc'ns Corp.*, 448 F.3d 1294 (Fed. Cir. 2006).
[3] *Id.*

On January 14, 2013, five months after this lawsuit was filed, Wunder began working with Raley & Bowick.  Wunder advised Omron's counsel Osha Liang of his plans, but Omron never objected to Wunder joining Raley & Bowick.  Wunder did <u>zero</u> work on this case with Raley & Bowick, and left the firm in May, 2014.  Now, with discovery almost complete, evidence stacking up, and trial rapidly approaching, Omron decided to file this motion to throw a wrench in this lawsuit. The Rules are designed to make sense.  They cannot be used to further Omron's goal.  There will be tremendous prejudice to NOV if Raley & Bowick is disqualified, and there will be no prejudice to Omron if its motion is denied.

Omron's motion incorrectly cites Texas Disciplinary Rule of Professional Conduct 1.09(a).  That applies to situations where the lawyer is <u>still with</u> the second law firm.  Since Wunder has <u>left</u> Raley & Bowick, Rule 1.09(<u>c</u>) is the applicable provision.  To violate this rule, there must be a <u>reasonable probability that client confidences will be disclosed</u> by Raley & Bowick's continued representation.  This is impossible.  Wunder no longer works here, and he testified during his recent deposition that he never had any confidences to disclose in the first place.

Even under a Rule 1.09(a) analysis, disqualification would be highly improper.  Unlike Omron's vague unsworn declarations, Brian Wunder testified under oath in deposition with specificity that (1) he was <u>never</u> disclosed confidential information at Osha Liang about matters pertaining to this lawsuit; and that (2) he <u>never</u> worked on this case at <u>either</u> firm:.

> Q (by Mr. Raley):    Rule  1.09(a)(3)  we'll  read  the  whole  thing  in  context.
> "<u>Without prior consent, a lawyer who personally has represented a client</u>
> <u>in a matter shall not thereafter represent another person in a matter adverse</u>
> <u>to  the  former  client  if  it  is  the  same  or  substantially  related  matter</u>,"
> correct?
>
> A:     That's what it reads.

Q:      *Yes.  Did you, Brian Wunder as a lawyer personally formerly represent Omron regarding an analysis of the '142 Patent, whether or not it's valid, whether or not Omron infringes?*

A:      **No**.

Q:      *Did you ever represent Omron in a substantially related matter to the 142 NOV patent, whether or not it's valid, whether or not Omron infringes?*

A:      **No**.[4]

\*                                    \*                                    \*

Q(by Mr. Raley):      *Have you ever read the Bowden 142 Patent that NOV has purchased?*

A:      **To the best of my – to the best of my knowledge, I have never read the patent**.

Q:      *Have you ever even glanced at the claims of the 142 Patent?*

A:      **Not to my knowledge**.

Q:      *Have you ever compared the claims to Omron's automatic driller tool?*

A:      **To my knowledge, no**.[5]

\*                                    \*                                    \*

Q(by Mr. Powers):      *What role did you play in monitoring either the reexamination proceeding, litigation with Pason, or any other NOV-related litigation?*

A:      **None**.[6]

\*                                    \*                                    \*

Q(by Mr. Raley):      *You did not personally provide representation to Omron regarding an analysis of the 142 Patent's validity or whether or not Omron infringed it, correct?*

A:      **That is correct**.

---

[4] Ex. A (Wunder Depo. at 57:6 – 23).
[5] Ex. A (Wunder Depo. at 34:12 – 25).
[6] Ex. A (Wunder Depo. at 86:10 – 14).

Q:      *You were personally not involved in detailed conversations regarding either of those issues when you were at Osha, correct?*

A:      **That is correct**.[7]

\*                              \*                              \*

Q(by Mr. Raley):      *So bottom line, you never worked on the NOV versus Omron matter when you were at Osha Liang, correct?*

A:      **That's correct**.

Q:      *You never worked on the NOV versus Omron matter when you were at Raley & Bowick?*

A:      **That's correct**.[8]

\*                              \*                              \*

Q(by Mr. Raley):      *So to sum up, you had no client confidences about the 142 validity prior art analysis to share with us because you were not involved with those at Osha Liang?*

A:      **That's correct**.

Q:      *You could not share them with us even if you were the sort of unethical person that would do something like that and we were the sort of unethical people that would listen. You could not share them with us because you didn't know them?*

A:      **That's correct**.

Q:      *And you left us five months ago?*

A:      **That's true**. [9]

Omron bears an extremely high burden of proof to disqualify Raley & Bowick.  Before

filing, Omron was required to meticulously examine all of the evidence.[10]  Omron completely

---

[7] Ex. A (Wunder Depo. at 113:9 – 16).
[8] Ex. A (Wunder Depo. at 114:17 – 23).
[9] Ex. A (Wunder Depo. at 121:9 – 122:7).

<u>ignored</u> Wunder's deposition and fired off its motion.  Wunder's conclusive testimony, standing alone, precludes disqualification.[11]  The evidence also shows that Omron sat on the documents it now uses to allege conflict for years, waiting to spring them if things did not go Omron's way. Omron long ago <u>waived</u> any right to even bring up this issue.  Moreover, even if Wunder possessed any confidences about Osha's analysis of the '142 patent's validity (which he testified he <u>doesn't</u>), those confidences have been <u>waived</u> by Omron's assertion of the advice of counsel defense.

The Disciplinary Rules were enacted to protect clients with real confidences and real concerns.  Nowhere in its entire motion does Omron disclose a specific confidence or a specific prejudice to Omron if Raley & Bowick continues to represent NOV.  In contrast, NOV's attached affidavit establishes that Omron's tactical ploy, if successful, could cost NOV millions of dollars and create extreme prejudice.[12]  For many reasons, described below, Omron's Motion should be denied.

## II.    TEXAS DISCIPLINARY RULE OF PROFESSIONAL CONDUCT 1.09

Disciplinary Rule 1.09 (emphasis added) states:

(a)    Without prior consent, a lawyer who personally has formerly represented a client in a matter <u>shall not *thereafter*</u> represent another persons in a matter adverse to the former client:

---

[10] *In re Texas Windstorm Ins. Ass'n*, 417 S.W.3d 119, 129 (Tex. App.—Houston [1st Dist.] 2013, no pet.)("To prevent the abusive filing of such a motion for tactical reasons, the court must carefully evaluate the motion and record to determine if disqualification is warranted.")

[11] Omron's disregard for the law, and its attack on the integrity of Wunder and NOV's counsel, is sanctionable conduct under Rule 11.  NOV asks the Court to remember Omron's motion if sanctions are requested in the future.

[12] Ex. B (American Intellectual Property Law Association Report of Economic Survey).  This report shows median litigation costs through the end of discovery in a patent litigation suit are $3 million, and median all-inclusive costs are $5 million.  <u>NOV's new counsel would have to redo years of litigation</u>.  *See* Ex. T (NOV Affidavit).

(1)  in which such other person questions the validity of the lawyer's services or work product for the former client;

(2)  if the representation in reasonable probability will involve a violation of Rule 1.05 ["Confidentiality of Information"]; or

(3)  if it is the same or a substantially related matter.

(b)  Except to the extent authorized by Rule 1.10, when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a).

(c)  **When the association of a lawyer with a firm has terminated, the lawyers who were then associated with that lawyer shall not knowingly represent a client if the lawyer whose association with that firm has terminated would be prohibited from doing so by paragraph (a)(1) or if the representation in reasonable probability will involve a violation of Rule 1.05**.

Omron has utterly failed to meet its burden of proof that Raley & Bowick's representation violates this rule.  The evidence is contrary.

## III.    FACTS

**A.    Wunder did No Work Relating to the '142 Patent Prior to Joining Raley & Bowick**

Sometime prior to May 2, 2006, Omron's president Robert Bost requested that John Osha of Osha Liang provide an opinion regarding whether NOV's United States Patent No. 5,474,142 is valid.[13]  Mr. Osha provided an opinion to Omron that recited the first reexamination of the '142 Patent in the PTO, a public record.

In 2006, Wunder went to work for Osha Liang as a contract attorney, being paid only for the time he billed.[14]  Wunder kept meticulous time records on all work he performed.[15]

In January 2010, Wunder agreed to be one of <u>eight</u> lawyers representing Omron in *Canrig*, which involved a completely unrelated patent, tool, and opponent.[16]  Omron was

---

[13] Ex. C (Wunder Depo. Exhibit 28).
[14] Ex. A (Wunder Depo 101:11 – 18).
[15] Ex. A (Wunder Depo. at 30:13 – 31:4).

accused of infringing Canrig's U.S. Patent No. 6,050,348 for: "A method and apparatus for precisely controlling [with a <u>top drive</u>] the *rotation* of a drill string."[17]   This technology has nothing to do with NOV's U.S. Patent '142 Patent on an automatic driller.  Omron argues in its motion to disqualify – with a straight face - that these two cases are substantially similar.[18]  **However, in responding to NOV's previous discovery requests about the *Canrig* case, Omron <u>admitted</u> the <u>opposite</u>:  "*[T]he Canrig case involved technology for the rotation of the drill string which [sic, is] irrelevant to the '142 Patent.*"**[19]   Omron is judicially estopped from changing its position.  Omron's flip flop heavily erodes the credibility of its motion.

On October 12, 2010, Wunder sent an email setting up a conference call with his *Canrig* clients and other lawyers about the "Delta-P Issue."[20]   Six days later, Wunder was copied on an email between different lawyers discussing a potential conference call "re Delta P."   Wunder testified that if he ever participated in any calls pertaining to the '142 Patent, he would have billed for it:

> Q(by Mr. Raley):         *If there are <u>no billing records reflecting any work by you on the 142 Patent while at Osha</u>, would that be evidence that you did no such work*?
>
> A:         **To me that would be <u>compelling</u> circumstantial evidence that <u>I did not do any work on that issue</u>.**

---

[16] *Canrig Drilling Technologies Ltd. v. Omron Oilfield & Marine, Inc. and Helmerich & Payne, Inc.* (Case No. 6:09-cv-414 in the Eastern District of Texas).  Ex. D (*Canrig* Docket Sheet).
[17] Ex. E (Canrig's U.S. Patent No. 6,050,348).
[18] *See* Motion at f.n. 6.
[19] Ex. F (July 18, 2014 Email from K. Dodd); *See also* Ex. G (Omron's August 18, 2014 objections to NOV's interrogatories)("Omron objects to this interrogatory because the *Canrig* case is neither relevant to any party's claims or defenses nor reasonably calculated to lead to the discovery of admissible evidence.  The *Canrig* case involved technology related to the rotation of the drill string.  This case involves technology related to the release of the drill string.")
[20] Ex. H (Wunder Depo. Exhibit W8).

Q:      *And that would include meetings and conferences and telephone calls analyzing the NOV 142 Patent.  If you had participated in those, you would have billed for them, correct*?

A:      **That's my practice, <u>yes</u>**.[21]

\*                              \*                              \*

Q(by Mr. Raley):      *If you had been involved in a meeting where the NOV 142 Patent was discussed and analyzed, would you have billed for it*?

A:      **Yes**.[22]

\*                              \*                              \*

Q (by Mr. Raley):      *And if you had participated in this call-in meeting and if the NOV 142 Patent was discussed in this call-in meeting, you would have billed for it because Osha had an open file available for billing*?

A:      **I would have recorded my time**.[23]

\*                              \*                              \*

Q(by Mr. Raley):      *Well, you would have recorded time for participating in a meeting where the NOV 142 matter was analyzed for Osha's client, Omron*?

A:      **I would have recorded my time and probably – if there were not a file, specific file for that work, then it would have been recorded to what's called the general file**.

Q:      *And your billing entry would have been detailed enough to clearly show what happened in the – in the [sic] – in the discussion that there was an analysis of the '142 Patent.  You wouldn't just say "phone call", you would say what it was about*?

A:      **It is my practice when working on the patent to identify the patent by number**.[24]

---

[21] Ex. A (Wunder Depo. at 31:14 – 23).
[22] Ex. A (Wunder Depo. at 43:8 – 11).
[23] Ex. A (Wunder Depo. at 45:5 – 9).
[24] Ex. A (Wunder Depo. at 45:20 – 46:8).

**Omron's attorneys have confirmed that they have looked and no such time records exist**.[25]   This is underline{conclusive} evidence that Wunder <u>never</u> participated in any conference calls or meetings about the '142 Patent.[26]

On February 14 - 16, 2011, Wunder was merely copied on an email chain from Omron to other lawyers.[27]   These emails did <u>not</u> discuss this litigation.  Wunder testified that if he had been involved in answering or discussing these emails that he would have billed for it.[28]   Despite Omron's recent search of Osha Liang's records, no such billing records exist.[29]

On June 11, 2011, Omron sent an email describing public information about NOV's litigation against Pason and copied Wunder on it.[30]   After this, underline{Wunder was *taken off* the email chain, and a call was set up between the lawyers *actually involved* in the issue}.  Wunder testified he was <u>never</u> involved in <u>any</u> discussions about NOV's '142 Patent.  He does not even know if they even ever happened:

> Q(by Mr. Raley):   *Please confirm, Mr. Wunder, that <u>you are not copied</u> by Lee Huddleston on his <u>e-mail</u> to Robert Bost <u>setting up this important conference</u>?*
>
> A:   **I'm not copied on that e-mail.**
>
> Q:   *<u>This matter that is too complex to discuss over e-mail</u> that he wants to setup a conference to discuss, <u>he doesn't copy you on the e-mail about setting up the conference</u>, does he, sir?*
>
> A:   **I'm not copied on the e-mail.**

---

[25] Exhibit I (October 14, 2014 Email from Matt Powers).

[26] This is not a case where there could be some meetings that were not billed.  Wunder testified that if a meeting happened there would be a time entry (whether it was billed and paid or not) to show it occurred.

[27] Ex. J (Wunder Depo. Exhibit W10).

[28] Ex. A (Wunder Depo. at 48:24 – 50:15).

[29] Ex. I (October 14, 2014 Email from Matt Powers).

[30] Ex. K (Wunder Depo. Exhibit W11).

Q:     *And you have no memory of being involved in any such conference, do you, sir*?

A:     **I do not**.

Q:     *And if you had been involved in such a conference, you would have as a matter of routine billed for it*?

A:     **I would have recorded my time**.[31]

\*                                    \*                                    \*

Q(by Mr. Powers):     *You don't, I take it, have a present-day recollection of the meeting that followed, if a meeting followed*?

A:     **I have no recollection that we ever had a meeting to discuss NOV' patent and what, if anything, to do about it or what our response would be.  I don't ever remember that happening.  If it did, I wasn't in it**.[32]

On August 5, 2011, *Canrig v. Omron* was dismissed when the parties settled**.**[33]  **[When NOV asked Omron in this case for a copy of the _Canrig_ settlement agreement, Omron refused to produce it, saying it was "_neither relevant nor likely to lead to the discovery of admissible evidence_."]**[34]

In December of 2011, Omron's Robert Bost requested an updated opinion from Osha Liang regarding the validity of the '142 Patent.[35]  Wunder recently testified that he had _no involvement in creating this opinion and had _no_ knowledge of the contents of this opinion_.[36]  Moreover, this very opinion has been produced by Omron!  Omron _relies_ on it in this case.  Any confidences regarding the opinions have been _waived_.[37]

---

[31] Ex. A (Wunder Depo. at 53:7 – 22).
[32] Ex. A (Wunder Depo. at 77:13 – 20).
[33] Ex. D (Canrig Docket Sheet).
[34] Ex. G (Omron's August 18, 2014 objections to NOV's interrogatories).
[35] Ex. L (Hopwood Deposition Exhibit 29).
[36] Ex. A (Wunder Depo. at 11:17 – 22).
[37] *Echostar Commc'ns Corp.*, 448 F.3d 1294 (Fed. Cir. 2006).

**B.     Wunder's Transfer to Raley & Bowick Did Not Risk Disclosure of Confidential Information or Otherwise Create a Conflict**

Omron alleges Wunder received the following information, with no detail, at Osha Liang: (1) Omron anticipated being sued by NOV for its infringing products; and (2) Omron thought NOV's patents were invalid. For the following reasons, neither fact justifies disqualification.

On August 23, 2012, NOV sued Omron for infringement of the '142 Patent.[38]  NOV was and is represented by Raley & Bowick.  Raley & Bowick's first discussion with Wunder about his potential employment was at least four months later.[39]  Raley & Bowick's attorneys working on this matter have provided the affidavits confirming they never talked to Wunder about anything related to the '142 Patent or Omron prior to (or after) filing this lawsuit.[40]

On October 19, 2012, Omron filed an answer, affirmatively putting NOV (and Raley & Bowick) on notice that it thought NOV's '142 Patent was invalid.[41]  On this date, Omron's defenses were made known to Raley & Bowick.[42]  This was three months before Wunder joined Raley & Bowick.  [Note:  Omron further disclosed all of its defenses by filing a petition for *Inter Partes* Review in the PTO, which has been denied, and by producing Osha Liang's written invalidity opinions.]

In late December 2012, Wunder contacted Raley & Bowick about a potential joint venture in a patent infringement lawsuit.[43]  Around this time, discussion began about Wunder potentially coming to work for Raley & Bowick.

---

[38] Doc.No. 1.
[39] Ex. M (R&B Affidavits).
[40] Ex. M (R&B Affidavits).
[41] Doc.No. 9 at 3 (Omron's Second Affirmative Defense) & 6 (Omron's Second Counterclaim).
[42] Ex. M (R&B Affidavits).
[43] Ex. A (Wunder Depo. at 66:9 – 21).

On January 14, 2013, Wunder came to work for Raley & Bowick.[44]  Wunder testified that he did a conflict check with Raley & Bowick partners before he started.[45]  During this conflict check, Raley & Bowick disclosed that they represented NOV in an infringement case over the '142 Patent against Omron.  Wunder testified that this is the first time he ever learned about a lawsuit against Omron by NOV regarding the '142 Patent.[46]  Wunder never disclosed knowing anything about the '142 Patent to Raley & Bowick.  Even if he <u>wanted</u> to, he <u>could not do so</u> because he had <u>never</u> worked at Osha Liang on <u>any</u> matters relating to the '142 Patent and had <u>nothing</u> to disclose:

> Q(by Mr. Raley):  *Okay.  So, the fact you didn't disclose to us anything about you working on the NOV 142 Patent while you were at Osha is evidence that you didn't do that kind of work at Osha, correct*?
>
> A:  **It is circumstantial evidence of that, that is correct**.
>
> Q:  *Thank you.  All right.  And the reason for that is because if you had done that kind of work, you would have told us that if you had done that kind of work, correct*?
>
> A:  **If I had done work, the kind that you suggest in your question, I would have brought that out if I knew you had an NOV/Omron case**.[47]

Wunder only disclosed one Omron matter he had worked on for Omron, the (as <u>admitted</u> by Omron) irrelevant *Canrig* case.  Out of an abundance of caution, and because they needed his help on other matters, Raley & Bowick decided Wunder should not work on the *NOV v. Omron* case.  Although this precaution was not required under the Rules, because these are completely

---

unrelated matters, Raley & Bowick wanted to avoid any appearance of impropriety.[48]  Wunder

never did any work on the *NOV v. Omron* matter:

> Q(by Mr. Raley):    *Please confirm, Mr. Wunder, that while you were at Raley & Bowick <u>you never did any work on the NOV versus Omron matter</u>.*
>
> A:    **Zero**.
>
> Q:    *Did you participate in any strategy discussions whatsoever regarding that matter, NOV versus Omron, while at Raley & Bowick?*
>
> A:    **Never**.
>
> Q:    *Did you prepare any expert witnesses?*
>
> A:    **No**.
>
> Q:    *Did you draft any motions or pleadings or briefing?*
>
> A:    **No**.
>
> Q:    *You said zero; that was the word you used earlier?*
>
> A:    **Zero**.[49]

<u>Wunder's prior work at Osha Liang on the *Canrig* matter did not involve *any* confidential</u>

<u>matters that relate to the present case</u>:

> Q (by Mr. Powers):    *Did you believe that the information that you acquired during the course of your past representation of Omron [in Canrig], if available to those who were prosecuting NOV's case, would be of use to them in their lawsuit?*
>
> A:    **No.  That's a very broad question, but the answer is no**.
>
> Q:    *Sitting here today, is your view any different?*
>
> A:    **No.  With the production of the [Osha Liang validity] opinions, it would seem to be that, if anything, there would be less scrutiny over my having worked here or having worked here in the past**.[50]

---

[48] Ex. A (Wunder Depo. at 88:21 – 89:8).
[49] Ex. A (Wunder Depo. at 18:10 – 25).
[50] Ex. A (Wunder Depo. at 89:25 – 90:12).

On February 5, 2013, Wunder informed Osha Liang attorneys that he had started working at Raley & Bowick.[51]  According to USPTO records, Osha Liang continued to represent Omron in patent prosecution matters through September of 2013 (Power of Attorneys signed by Omron's president Robert Bost).[52]  Knowledge about Wunder's employment at Raley & Bowick is imputed to Omron through its attorneys.[53]  Omron sat on readily available information for twenty months before filing this motion.

On February 7, 2013, the parties filed a joint agreed scheduling order, entered by the Court, that focused on claim construction phase.[54]  The parties briefed claim construction issues before the Special Master and had a *Markman* hearing on the same.

On August 30, 2013, this Court entered a *Markman* order ruling on claim construction issues.[55]

On September 5, 2013, this Court entered a scheduling order setting the deadline for discovery on October 3, 2014, the dispositive motion deadline for December 1, 2014, and the trial for April of 2015.[56]  The discovery deadline has since been extended to November 14, 2014.[57]

On September 13, 2013, NOV sent interrogatories and requests for production to Omron. On October 25, 2013, Omron responded to NOV's interrogatories asking when Omron first

---

[51] Ex. N (Wunder Depo. Exhibit W5) and Ex. A (Wunder Depo. at 16:11 – 17:16).
[52] Ex. O (PTO Records).
[53] *McMahon v. Greenwood*, 108 S.W.3d 467 (Tex. App. – Houston [14th Dist.] 2003).
[54] Doc.No. 23.
[55] Doc.No. 54.
[56] Doc.No. 55.
[57] Doc.No. 80.

learned of NOV's '142 Patent.  This discovery request placed a duty on Omron, and its attorneys, to find this information.[58]  Omron responded:

> [O]mron has known about the '142 patent since at least 2006.  Omron does not recall exactly when it became aware of the '142 patent or how.  Omron identifies the following individual as most knowledgeable about this response: Robert Bost.[59]

NOV's specific request for production at this time stated:

> **If Omron plans to present an opinion of counsel defense [to willful infringement], produce all documents relating to this opinion, produce the opinion, producing billing records and invoices for the opinions, and produce internal communication about the opinion**.[60]

Omron responded on <u>October 25, 2013</u>:  **"*[O]mron will not produce any documents responsive to this request*."**[61]

October 2013 is the absolute last date that Omron knew or should have known about all documents that Osha Liang maintained relating to the invalidity opinions.  If Robert Bost did not disclose these opinions and related documents to his current counsel, he violated his discovery obligations.  If Omron's counsel were provided the invalidity opinions and related documents, and chose to withhold this information in responding to NOV, they violated their discovery obligations and their duties as officers of the Court.  Under either scenario, Omron and its employees apparently chose to conceal this information until now.  <u>After laying low for two years, they waited until the last stage of litigation, after Omron waived the attorney client privilege and produced validity opinions, to claim that Wunder, who never worked on a '142 patent issue at either firm, and left Raley & Bowick five months ago, is a sufficient basis to disqualify NOV's decade-long '142 patent litigation counsel.</u>

---

[58] Fed. R. Civ. P. 26, 33, & 34.

[59] Ex. P (Omron's Response to NOV's First Interrogatories – October 25, 2013).

[60] Ex. Q (Omron's Response to NOV's First RFP – October 25, 2013).

[61] *Id.*

If there was ever a bogus "conflict" argument, this is it.  The law does not allow the Disciplinary Rules to be used in such a manner.[62]

## IV.   OMRON'S MOTION SHOULD BE DENIED

**A.   Omron Bears a Heavy Burden to Prove Disqualification**

Texas federal courts consider the Texas Disciplinary Rules of Professional Conduct, the ABA Model Rules of Professional Conduct, and their local rules in determining whether disqualification is appropriate.[63]  "Motions to disqualify are 'substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law.'"[64] Texas cases interpreting the disciplinary rules are not binding, but this Court may look to them for guidance.[65]

Disqualification of a party's counsel is "a severe remedy."[66] "It can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice."[67]  "Disqualification can delay proceedings in the trial court, require the client to engage a successor attorney, and, in appropriate cases, deprive the client of work product done on his behalf by the disqualified attorney."[68]  "Because of the serious consequences of disqualification of opposing counsel, such motions can be misused for delay or to exert

---

[62] *In re Texas Windstorm Ins. Ass'n*, 417 S.W.3d 119, 129 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("The law strongly discourages the use of motions to disqualify as tactical weapons in litigation." )
[63] *In re ProEducation Int'l, Inc.*, 587 F.3d 296, 299 – 300 (5th Cir. 2009).
[64] *M-I LLC v. Stelly*, No. 4:09-cv-1552, 2010 U.S. Dist. LEXIS 52736, *3 (S.D. Tex. 2010).
[65] *See, e.g, OneBeacon Ins. Co. v. T. Wade Welch & Associates*, 2012 WL 393309, at *5 (S.D. Tex. 2012).
[66] *In re Nitla S.A. de C.V.,* 92 S.W.3d 419, 422 (Tex. 2002).
[67] *Id.*
[68] *In re Texas Windstorm Ins. Ass'n*, 417 S.W.3d 119, 129 (Tex. App.—Houston [1st Dist.] 2013, no pet.)

inappropriate leverage to force a settlement."[69]   "The law strongly discourages the use of motions to disqualify as tactical weapons in litigation."[70]   This is *exactly* what Omron is trying to do in this case.

Omron has the burden of proof to establish that disqualification is required in this case.[71] "To prevent the abusive filing of such a motion for tactical reasons, the court must carefully evaluate the motion and record to determine if disqualification is warranted."[72]   Omron cannot meet its burden.   Further, NOV has presented overwhelming evidence that disqualification is improper.

## B.   Rule 1.09(c) is the Relevant Portion of Rule 1.09, and It in No Way Allows Disqualification of Raley & Bowick

Wunder's association with Raley & Bowick terminated when he left the firm on May 1, 2014.   Rule 1.09(a) and (b) relate to situations where the alleged conflicted lawyer (Wunder) is still continuing to work with a firm on a matter.   Even under those sections, disqualification is improper.   In light of the evidence, however, Rule 1.09(c) is the section which should be used "when the association of a lawyer with a firm has terminated."

The appropriate interpretation of Rule 1.09(c) to this case is as follows:

**When the association of a lawyer** [Wunder] **with a firm** [Raley & Bowick] **has terminated, the lawyers who were then associated with that lawyer** [Raley & Bowick] **shall not knowingly represent a client** [NOV] **if the lawyer** [Wunder] **whose association with that firm** [Raley & Bowick] **has terminated would be prohibited from doing so by paragraph (a) (1)** [legal malpractice] **or if the representation in reasonable probability will involve a violation of Rule 1.05** [violation of client confidences].

---

[69] *Id* (citing *Industrial Acc. Bd. of State of Tex. v. Spears,* 797 S.W.2d 55, 658 (Tex. 1990).
[70] *Id.*
[71] *In re EPIC Holdings, Inc.,* 985 S.W.2d 41, 60 (Tex. 1998).
[72] *In re Texas Windstorm*, 417 S.W.3d at 129.

Omron agrees that Rule 1.09(a)(1) (legal malpractice) is not applicable, so <u>this Court only has to determine whether there is a reasonable probability that client confidences will be violated by Raley & Bowick's continued representation of NOV</u>.  Any such violation of client confidences would be *impossible* under the facts for three reasons:  (1) Wunder never had any relevant client confidences to begin with; (2) Raley & Bowick would have never asked him for client confidences if he had them; and (3) Wunder would not have disclosed them:

> Q(by Mr. Raley):        *Do you agree that it would be <u>impossible for you to disclose confidential information to Raley & Bowick if you did not possess confidential information</u>?*
>
> A:        **That's logical; agreed**.[73]
>
> \*                                              \*                                              \*
>
> Q(by Mr. Raley):        *So with that in mind, let's look at 1.09 together (c): "When the association of lawyer" – Brian Wunder – "with a firm" – Raley & Bowick – "has terminated, the lawyers who were then associated with that lawyer" – Raley & Bowick – "shall not knowingly represent a client" – NOV – "if the lawyer whose association with that firm has terminated would be prohibited by doing so by paragraph (a)(1)" – which I represent to you is not applicable – or would involve – or "in reasonable probability will involve violation of Rule 1.05", client confidentiality.  Did I read that correctly?*
>
> A:        **You did**.
>
> Q:        <u>*Do you have an opinion, sir, as to whether or not there is reasonable probability that Raley & Bowick's continuation to represent NOV in a matter against Omron will involve a violation of Rule 1.05 client confidences?*</u> *Do you agree that there is no such reasonable probability?*
>
> A:        **You asked me if I have an opinion and I –**
>
> Q:        *What is your opinion?*
>
> A:        **I do have an opinion.  And my opinion is that it would be <u>impossible</u> because I never disclosed anything in my head about Omron to anyone at Raley & Bowick**.[74]

---

[73] Ex. A (Wunder Depo. at 36:19 – 22).

Q:     *So your opinion is it would be impossible for Raley & Bowick's continued representation of NOV in the Omron matter to involve a violation of Rule 1.05 client confidences?*

A:     **Vis-à-vis me, yes**.

Q:     *And you left Raley & Bowick in May of 2014?*

A:     **That's correct**.

Q:     *And have had no discussion with us regarding the NOV versus Omron matter or any client confidences or anything since you left?*

A:     **That's correct**.

Q:     *And you have no intention of ever having such discussions with us?*

A:     **I do not**.

Q:     *Even if we ask you about them, which we won't, you wouldn't tell us because you keep client confidences?*

A:     **<u>If I had client confidential information in my head, it will remain there</u>**.

Q:     *And as you've described to us, <u>you don't even have any because you didn't do work on the NOV 142 Patent while at Osha, correct</u>?*

A:     **That's correct**.

Q:     *So **<u>that's another reason it would be impossible to violate client confidences</u>.  There are actually several reasons.  One is <u>you would not never do it, we would never ask for it</u>.  And the other is <u>you don't have them to begin with, correct</u>?***

A:     **<u>Correct</u>**.[75]

According to Omron's Motion, the only alleged confidential information in Wunder's possession when he came to Raley & Bowick was "the potential for a lawsuit by NOV against

---

[74] Ex. A (Wunder Depo. at 60:17 – 61:3).
[75] Ex. A (Wunder Depo. at 59:4 – 61:9).

Omron based on the '142 Patent …"[76]  Wunder came to work for Raley & Bowick *five months after* NOV sued Omron.  There were no confidences about the "potential" for a lawsuit.  The lawsuit was already a public record.  Omron hired another law firm to handle the lawsuit – Foley & Lardner – who disclosed all of Omron's litigation strategies in its answer.[77]  Omron's defenses became public knowledge long before Wunder came to Raley & Bowick.

No relevant confidential information was ever disclosed to Wunder.  This is why Omron's declarations are so vague.  Wunder's specific, sworn testimony completely trumps Omron's declarations.  Wunder confirmed he was never involved in any pre-suit "planning," as alleged by Omron:

> Q (by Mr. Powers):   *And did you, in fact, participate with Lee Huddleston and Mike Hartmann in considering and coming up with a plan as directed*?
>
> A:      **No**.[78]
>
> *                              *                              *
>
> Q(by Mr. Raley):      *If you attended a meeting or a conference at Osha Liang for the purposes of analyzing the 142 Patent's validity, as a matter of routine, would you have billed for it*?
>
> A:      **Yes**.
>
> Q:      *If you had attended a meeting or conference for the purposes of analyzing whether or not Omron infringed the 142 Patent, as a matter of routine, would you have billed for it*?
>
> A:      **That would have been my practice, yes**.

---

[76] Motion at 3.

[77] Omron's invalidity arguments were also completely disclosed when Omron petitioned the PTO for inter partes review to examine the validity of NOV's '142 Patent, which they lost. Omron has produced and is relying on the Osha Liang validity opinions (based on the same arguments rejected by the PTO) *in this litigation*.  There is absolutely no confidential information.

[78] Ex. A (Wunder Depo. at 84:3 – 6).

Q:   *If you had done any work on either of those matters, validity or infringement personally as a matter of routine, would you have billed for it?*

A:   **Yes**.

Omron admits that it searched for billing records and none exist.  There was, is, and will never be any risk of confidential information being disclosed to Raley & Bowick.  Omron cannot meet its burden to rebut the overwhelming evidence that disqualification of Raley & Bowick would be wrong.

Omron claims that the fact that Wunder no longer works at Raley & Bowick "does not change the outcome" relating to disqualification.[79]  Omron fails to mention that the cases it cites relate to lawyers that actually worked on the other side of a case and were proven to have confidential information.[80]  Omron cannot prove either of these elements.

**C.    Even if Rules 1.09(a) and (b) Applied, Disqualification would be Improper Because Wunder Never Worked on a "Substantially Related Matter" for Omron**

Rule 1.09(a) and (b) do not apply because they refer to continued representation - as if Wunder still worked at Raley & Bowick.  As shown above, Rule 1.09(c) is the correct section of the rule to use, and it plainly does not allow for disqualification.  However, <u>even if Rules 1.09(a) and (b) applied, Omron would still have to prove "that the present and former matters are so 'substantially related' that confidential client information may be presumed to have been disclosed or that such information was actually disclosed by counsel."</u>[81]  To show matters are "substantially related," the movant must establish: (1) an actual attorney-client relationship; and (2) "a 'substantial relationship between the subject matter of the previous relationship and the

---

[79] Motion at 9 – 10.
[80] *Id.*
[81] *Commonwealth Sci. & Indus Research Org.*, 297 Fed. Appx. at 975 (citing *Am. Airlines*, 972 F.2d at 614 – 15); *Tex. Serenity Acad., Inc. v. Glaze*, 2012 U.S. Dist. LEXIS 172347, *5 – 6 (S.D. Tex. 2012).

current dispute."[82]  "A 'substantial relationship' may be found only after the moving party delineates with specificity the subject matters, issues, and causes of action common to the prior and current representations."[83]  Omron has failed to meet its burden.  Indeed, the evidence is contra.

### 1.    Wunder testified that he never worked on any matter relating to the '142 Patent while at Osha Liang

Wunder confirmed, under oath, that he never worked on any matter relating to the '142 Patent while at Osha Liang:

Q (by Mr. Raley):    *Rule 1.09(a)(3) we'll read the whole thing it [sic] in context.  Without prior consent, a lawyer who personally has represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client if it is the same or substantially related matter, correct*?

A:    **That's what it reads**.

Q:    *Yes.  Did you, Brian Wunder as a lawyer personally formerly represent Omron regarding an analysis of the '142 Patent, whether or not it's valid, whether or not Omron infringes*?

A:    **No**.

Q:    *Did you ever represent Omron in a substantially related matter to the 142 NOV patent, whether or not it's valid, whether or not Omron infringes*?

A:    **No**.[84]

*                              *                              *

Q(by Mr. Powers):    *What role did you play in monitoring either the reexamination proceeding, litigation with Pason, or any other NOV-related litigation*?

A:    **None**.[85]

---

[82] *Tex. Serenity Acad.*, 2012 U.S. Dist. LEXIS 172347, at *6 (citing *Am. Airlines*, 972 F.2d at 614).

[83] *Id*. at *7.

[84] Ex. A (Wunder Depo. at 57:6 – 23).

\*                                        \*                                        \*

Q(by Mr. Raley):     *You did not personally provide representation to Omron regarding an analysis of the 142 Patent's validity or whether or not Omron infringed it, correct*?

A:     **That is correct**.

Q:     You were personally not involved in detailed conversations regarding either of those issues when you were at Osha, correct?

A:     **That is correct**.[86]

\*                                        \*                                        \*

Q(by Mr. Raley):     *So bottom line, you never worked on the NOV versus Omron matter when you were at Osha Liang, correct*?

A:     **That's correct**.

Q:     *You never worked on the NOV versus Omron matter when you were at Raley & Bowick*?

A:     **That's correct**.[87]

\*                                        \*                                        \*

Q(by Mr. Raley):     So to sum up, *you had no client confidences about the 142 validity prior art analysis to share with us because you were not involved with those at Osha Liang*?

A:     **That's what [sic] correct**.

Q:     You could not share them with us even if you were the sort of unethical person that would do something like that and we were the sort of unethical people that would listen.  *You could not share them with us because you didn't know them*?

A:     **That's correct**.

Q:     *And you left us five months ago*?

---

[85] Ex. A (Wunder Depo. at 86:10 – 14).
[86] Ex. A (Wunder Depo. at 113:9 – 16).
[87] Ex. A (Wunder Depo. at 114:17 – 23).

A:     **That's true**.

Q:     *And the alleged client confidence have now been produced in the case and they are going to use them*?

A:     **The opinions have been produced**.

Q:     *In answer to clients – in answer to counsel's questions, you said the meetings were devoted to the Canrig case and the subject of Delta p may have come up with the idea that this is something that should be discussed, but you did not participate in any of the detailed discussion, correct*?

A:     **That's correct**.[88]

*Wunder has never even read NOV's '142 Patent:*

Q(by Mr. Raley):     <u>*Have you ever read the Bowden 142 Patent that NOV has purchased*</u>?

A:     **To the best of my – to the best of my knowledge, <u>I have never read the patent</u>**.

Q:     *Have you ever even glanced at the claims of the 142 Patent*?

A:     **No to my knowledge**.

Q:     <u>*Have you ever compared the claims to Omron's automatic driller tool*</u>?

A:     **To my knowledge, <u>no</u>**.[89]

Omron's disqualification argument is impossible under the facts in evidence.  Wunder did no work of any sort pertaining to the '142 Patent at either law firm.  Indeed, Wunder does not even know what the technology of the '142 Patent relates to.[90]

---

[88] Ex. A (Wunder Depo. at 121:9 – 122:7).
[89] Ex. A (Wunder Depo. at 34:12 – 25).
[90] Ex. A (Wunder Depo. 34:12 – 25).

2.    **Omron's declarations are not credible, and are completely trumped by Wunder's testimony.**

Omron presents self-serving declarations from its in-house attorney, Blake Thatcher, and a prior Osha Liang attorney, H. Lee Huddleston, Jr. (a disgruntled lawyer Wunder once fired from the *Canrig* case for poor performance).[91]   These declarations must be disregarded for several reasons.

Omron's declarations from interested parties are not credible.   The declarants have concealed themselves from cross examination.   On the other hand, Wunder has testified, is no longer employed at Raley & Bowick, has no interest in this case, and has no incentive to be untruthful.   He is in the best position to testify about the work that <u>he performed</u> – or did <u>not</u> perform.   He was cross examined at length by Omron's attorneys and has made himself available as a disinterested witness.

Conversely, Omron's in-house lawyer has every incentive to delay this case and force NOV to hire new counsel at this late stage of litigation.   If Omron prevails, NOV will suffer significant prejudice and be forced to pay its new lawyers to review several years of litigation history in an effort to prepare for trial.   Omron does not want to go to trial in this case.   This disqualification motion appears to be pure gamesmanship to either force a continuance or harm NOV's ability to prepare for trial.

Further, Texas and federal courts universally hold that declarations (or affidavits) are never as credible as live testimony.   The United States Supreme Court has held:  "In almost every setting where important decisions turn on questions of fact, <u>due process requires an</u>

---

[91] Omron's Motion at Exhibits A & C.

opportunity to confront and cross-examine adverse witnesses."[92]   The Texas Supreme Court has held:

> **Cross-examination is a safeguard essential to a fair trial and a cornerstone in the quest for truth. Longstanding principles of our jurisprudence recognize the right and necessity of full and complete cross-examination**.[93]

Texas appellate courts have emphasized the importance of "broad and wide-ranging" cross examination:

> The allowed scope of cross-examination is broad and wide-ranging and extends to any matter relevant to the issues.  *Hogue v. Kroger Store No. 107, 875 S.W.2d 477, 480* (Tex.App.—Houston [1st Dist.] 1994, writ denied).  Relevancy permits inquiry into the witness's interest, bias, motives, inclinations, and prejudices.  *Id. In Texas Employers' Insurance Ass'n v. Garza,* 308 S.W.2d 521, 527 (Tex.Civ.App.—Amarillo 1957, writ ref'd n.r.e)[94]

Federal and Texas courts routinely deny summary judgment affidavits based on the same concerns raised in this case – they lack credibility, particularly when parties present differing issues of fact:  "Conclusory affidavits are not enough to raise fact issues.  They are not credible nor susceptible to being readily controverted."[95]

Omron has had the opportunity to talk to and cross examine Wunder and to develop any facts it wanted.  Conversely, NOV has been denied any opportunity to cross examine Thatcher and Huddleston.  They hide behind vague declarations crafted by Omron's counsel to assist in filing an eleventh-hour motion to disqualify.  Omron's declarations should be disregarded in their entirety because there is no evidence of any threat of disclosure.[96]

---

[92] *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970).
[93] *Davidson v. Great Nat. Life Ins. Co.,* 737 S.W.2d 312, 313 (Tex.1987).
[94] *Russell Stover Candies, Inc. v. Elmore*, 58 S.W.3d 154, 157 (Tex. App. 2001).
[95] *Ryland Group, Inc. v. Hood, et. al.*, 924 S.W.2d 120, 122 (1996); *McIntyre v. Ramirez,* 109 S.W.3d 741, 749-50 (Tex. 2003).
[96] Alternatively, if this Court is inclined to consider these declarations, NOV's attorneys should be allowed to depose these witnesses

### 3.    Omron's declarations fail to meet the Fifth Circuit's specificity requirement.

Even if the Court considers Omron's lawyers' self-serving declarations, it cannot infer from them that Wunder had any involvement in the '142 patent dispute or that Raley & Bowick's representation poses any genuine threat of disclosure of any confidential information.  The Fifth Circuit has consistently held that disqualification affidavits must delineate "with specificity the subject matters, issues, and causes of action presented in the former representation" and that a "superficial resemblance between the present and prior representations" is not sufficient to support disqualification.[97]

In the *Duncan* case, Merrill Lynch sought to disqualify its former counsel, Smathers & Thompson, from representing members of a class action filed against Merrill Lynch.  In support of its disqualification motion, Merrill Lynch submitted an affidavit listing ten matters in which the firm represented Merrill Lynch over 10 years.  The affidavit explained, in general terms, that the firm represented Merrill Lynch in matters that:

> Involved stock, commodities, municipal and government securities, margin accounts, Merrill Lynch's relationships with its customers, Merrill Lynch's relationships with its employees, Merrill Lynch's procedures and its records, the rules and regulations of various regulatory bodies, the federal securities laws, the Florida securities laws and specifically Chapter 517, class actions and common law.  The work performed by the Smathers firm has included reviews of Merrill Lynch records, conferences with Merrill Lynch officers and employees, legal research, depositions, interrogatories, requests to produce, expert witnesses, hearings, motions, trials and appeals.  The Smathers firm has performed its work in various parts of Florida and in New York, and attorneys in the Merrill Lynch Law Department have worked closely with lawyers from the Smathers firm, as have other Merrill Lynch representatives who were involved in the matters. In connection with these listed cases, Merrill Lynch has paid the Smathers firm some $85,000 in the last five years.[98]

---

[97] *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1029 (5th Cir.1981), disavowed on other grounds.
[98] *Id.*

Merrill Lynch provided an additional affidavit which elaborated on several of the cases. <u>The Fifth Circuit held these affidavits failed to describe with sufficient detail</u> the relationship between the firm's prior and present representations or that the firm had knowledge of Merrill Lynch's practices and procedures which were the subject matter of the current suit. It cautioned that the district court must focus on "the precise nature of the relationship between the present and former representation" and conduct a "painstaking analysis of the facts."[99]

Omron's declarations are <u>far</u> less precise than the affidavits of *Duncan*, and utterly fail to establish that Wunder ever had <u>any</u> substantial relationship with the '142 patent. They fail to describe with any detail what knowledge Wunder allegedly had related to the issues before this Court.

Huddleston opines that Wunder "was involved in counseling Omron" regarding the patent and participated in phone calls and emails, but he provides no detail about what was allegedly discussed. Huddleston does not claim Wunder reviewed the patent, advised on the patent, participated in litigation strategy, or helped prepare any documents. He cannot explain what confidential information Wunder could possibly have learned. The declaration of Huddleston and the emails it relies on suggest only that Wunder may have been privy to a brief mention of the mere existence of the '142 patent. Assuming this is true, it is immaterial. Wunder could not and cannot share confidential information he never learned.

Omron's own declarations establish that anything Wunder might have learned at Osha Liang was public knowledge. The fact that NOV had an Auto Driller patent and tool was known publicly, and the fact that Omron had a very similar automatic driller was also known. Under the circumstances, any possible knowledge by Wunder that litigation might someday occur is self-

---

[99] *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1029 (5th Cir.1981).

evident.  Omron's recent waiver of its attorney-client privilege further eroded any basis for this motion.

Thatcher's declaration is even less meaningful than Huddleston's.  Thatcher recites that sometime in 2009 or 2010 Omron "thought it might get sued" for infringement of the '142 patent.  His declaration recites a tortured explanation of how Wunder might have become involved in the '142 patent as a result of his involvement in a completely different case.  He also claims to have had "discussions" with Wunder, and he personally believed Wunder would "maintain the confidentiality of these matters."  Thatcher, like Huddleston, never states what "these matters" are or what "disclosure" Wunder could have made to Raley & Bowick.[100]  These vague declarations cannot be used to overcome Wunder's very specific sworn testimony about his own actions, knowledge, or lack thereof.

**4.   Wunder's involvement in *Canrig v. Omron* is <u>not</u> "substantially related" to this litigation.**

Wunder was one of several lawyers who represented Omron in the *Canrig* case.  *Canrig* has nothing to do with this case for the following reasons:

a)   <u>**Omron admits in its discovery responses that *Canrig* is not related to this case**</u>, and should now be judicially estopped from arguing otherwise.[101]

---

[100] Curiously, Thatcher's declaration states, ". . . if Mr. Wunder disclosed to Raley & Bowick the fact that he had represented Omron during his time at Osha Liang, such disclosure was not authorized by me." (Thatcher declaration, p. 2).  Taken at its word, Thatcher's declaration suggests Wunder had no authority (or duty) to disclose any conflict involving Omron.  That is because Wunder had no conflict.

[101] **Ex. F (July 18, 2014 Email from K. Dodd)("But as a preliminary matter, I believe the Canrig case involved technology for the rotation of the drill string, which irrelevant to the '142 Patent.");** *See also* **Ex. G (Omron's August 18, 2014 objections to NOV's interrogatories)(stating that the *Canrig* case is irrelevant because it involves completely different technology).**

b)      The patent examiner, who is presumed to be skilled in the art of the technology he or she is examining, never cited NOV's '142 patent while examining Canrig's patent application.[102]  *In re Swanson*, 540 F.3d 1368, 1377 (Fed. Cir. 2008).  This is because Canrig's patent discloses the use of a <u>top drive motor</u> to control the <u>rotation</u> of drill string.[103]  Canrig's patent does not mention anything about automatically increasing and decreasing the rate of <u>release</u> of drill string in response to changes in drilling fluid pressure, which is the invention of the '142 patent at issue in this case.[104]

c)      Wunder, an attorney that worked on *Canrig*, testified that it had nothing to do with this litigation.[105]

The *Canrig* litigation cannot meet the substantial relationship test.

## D.      Omron Long Ago Waived Any Conflict that May Have Existed

On September 12, 2012, less than a month after NOV filed this suit and prior to Omron's answer, Omron's president Robert Bost contacted Lee Huddleston to ask him for additional copies of Huddleston's validity opinion.[106]  Bost followed up this call to Huddleston, letting him know that he located the opinions in another Omron employees' office.[107]   Huddleston responded:

> No problem.  I'm sure we'll be in touch at some point regarding the contents. Please make certain that you have the two "original" copies of the two opinions. Both should be spiral bound and signed in ink (typically blue).  ***Your litigation counsel*** [Foley & Lardner] ***will want those in a safe place.***[108]

---

[102] Ex. E (U.S. Patent No. 6,050,348).  Although Omron refused to produce its expert reports from the *Canrig* case, NOV would bet that Omron's invalidity expert never mentioned NOV's '142 Patent as having anything to do with the technology disclosed in Canrig's patent.

[103] *Id.*

[104] Ex. E (U.S. Patent No. 6,050,348).

[105] Ex. A (Wunder Depo. at 102:15 – 103:9).

[106] Ex. R (OSHA0000037).

[107] Ex. R (OSHA0000037).

[108] Ex. R (OSHA0000037).

Omron and its counsel have had these two validity opinions during this entire case.  There are several, independent duties that were imposed on Omron to produce these opinions and the recently alleged conflict documents years ago:

**Duty 1:**    On January 15, 2013 (the day after Wunder came to work at Raley & Bowick), Omron should have produced and listed these validity opinions in Omron's Fed. R. Civ. P. 26 disclosures.[109]

**Duty 2:**    On September 25, 2013, NOV sent its first interrogatory asking when Omron first learned about NOV's '142 Patent.  Instead of disclosing the dated opinions plainly showing when Omron knew about NOV's '142 Patent, Omron responded that "Omron does not recall exactly when it became aware of the '142 patent or how."[110]

**Duty 3:**    On September 25, 2013, NOV sent its first requests for production asking very specifically for any documents similar to the alleged conflict documents:

> If Omron plans to present an opinion of counsel defense [to willful infringement], produce all documents relating to this opinion, produce the opinion, producing billing records and invoices for the opinions, and produce internal communication about the opinion.[111]

Omron responded:   "[O]*mron will not produce any documents responsive to this request*."[112] There is no excuse for Omron to not locate these alleged conflict documents in response to this request.

Wunder told attorneys at Osha Liang that he was going to Raley & Bowick, and Wunder's profile was put on Raley & Bowick's webpage.  Osha Liang attorneys maintained

---

[109] Ex. S (Omron's January 15, 2013 Initial Disclosures).
[110] Ex. P (Omron's Response to NOV's First Interrogatories – October 25, 2013).
[111] Ex. Q (Omron's Response to NOV's First RFP – October 25, 2013).
[112] *Id.*

contact with Omron until <u>at least</u> September 15, 2013 – over a year <u>after</u> this lawsuit was filed.[113]
Wunder's employment at Raley & Bowick was never a secret.

Omron chose to conceal these documents until now.  Omron's failure to timely raise this issue has waived all rights to any alleged "conflict."  Texas courts have consistently found waiver present in far shorter time periods than this:

- *Buck v. Palmer*, 381 S.W.3d 525, 528 (Tex. 2012)(holding that a <u>seven month</u> delay to raise a motion to disqualify waived the right to do so);

- *Vaughan v. Walther*, 875 S.W.2d 690, 690 – 91 (Tex. 1994)(holding that a <u>six month</u> delay waived the right to disqualify);

- *HECI Exploration Co. v. Clajon Gas Co.*, 843 S.W.2d 622, 628 – 29 (Tex. App. – Austin 1992)(holding that a <u>four month</u> delay waived the right to disqualify);

- *Conoco, Inc. v. Baskin*, 803 S.W.2d 416, 419 (Tex.App. – El Paso 1991)(holding that a <u>four month</u> delay waived the right to disqualify); and

- *Carbo Ceramics v. Norton-Alcoa Proppants*, 155 F.R.D. 158, 161 (N.D. Tex. 1994) (disqualification motion raised after years of litigation was too late).

"The untimely urging of a disqualification motion lends support to any suspicion that the motion is being used as a tactical weapon."  *Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466, 468 (Tex. 1994).  Omron is attempting a tactical ambush, alleging confidences that do not exist.

## E.   All Rules of Reason and Justice Argue Against Disqualification

Wunder has been gone from Raley & Bowick five months.  Wunder testified that he did no work on any matter "substantially related" to this case and has never had any confidential information related to this case.[114]   Raley & Bowick attorneys have submitted affidavits confirming that they never knew anything about this alleged conflict until it was first raised by Omron in September, 2014 (four months after Wunder left and over two years after this case was

---

[113] Ex. O.
[114] Ex. A, Wunder Depo.

filed).[115]   NOV has submitted an affidavit confirming that this disqualification would cost it hundreds of thousands of dollars, delay its recovery, deny its fundamental right to choose its own counsel, and cause it extreme prejudice by taking away the lawyers most familiar with the '142 Patent and the facts of this case.[116]

Under these facts, disqualification is highly improper.[117]   In *Carbo Ceramics*, an allegedly conflicted attorney billed 200 hours on the opposing side of the exact same case.[118] The plaintiff moved to disqualify and argued that there was an "irrebuttable presumption" that disqualification was necessary.[119]   Once the alleged conflict was learned, the new law firm immediately terminated the alleged conflicted lawyer,[120] and the defendants who communicated with the conflicted lawyer submitted affidavits confirming they never received any confidential information.[121]   The Court determined not to disqualify defendants:

> Under the circumstances an irrebuttable presumption of imputed knowledge is *unduly harsh*!  It is not contrary to Fifth Circuit law to allow the presumption to be rebutted, particularly where promulgated ethical standards related to imputed knowledge have never been construed or rejected by that Court.
>
> *                         *                         *
>
> Plaintiffs' second argument attacks the personal integrity of attorneys employed by Fish & Richardson and far exceeds the bounds of permissible advocacy. It is unworthy of pleadings filed by a licensed lawyer. Without citation to any authority Carbo states that the Fifth Circuit has adopted a rule of an irrebuttable presumption because of that Court's recognition that a party opposing a motion to disqualify "could easily conceal the truth" and that the chances of the proponent of the motion being able to ferret out the truth in such circumstances "ranges somewhere between slim and none." The absence of authority is not surprising. Indeed counsel may review the entire body of reported opinions of the Fifth

---

[115] Ex. M (R&B Affidavits).
[116] Ex.  T (NOV Affidavit).
[117] *Carbo Ceramics, Inc. v. Norton-Alcoa Proppants*, 155 F.R.D. 158 (N.D. Tex. 1994).
[118] *Id*. at 160.
[119] *Id*.
[120] *Id*.
[121] *Id*.

Circuit without finding such an expression of crass cynicism directed against the legal profession and practicing lawyers.

While it is within the realm of possibility that unethical conduct has occurred in this case, it is appropriate to recall another presumption, that is, that a person who makes statements under oath or penalty of perjury is presumed to tell the truth, which is a cornerstone of the resolution of disputes under the "rule of law". Surely no less should be presumed with regard to such statements given by attorneys who in addition have taken an oath to uphold the law as officers of the court. As with most presumptions, this one is also rebuttable. But here Carbo has presented not even a hint of an inference of untruth, save for the cynicism expressed by its counsel,[7] which is not only unseemly but is also totally without merit.

\*                                  \*                                  \*

For the reasons stated above, Plaintiffs' motion will be denied. In the alternative if the issue be close it is appropriate to consider the effect which disqualification would visit on Defendants. As reflected in the affidavit of F. Alan Frick (Defendants' Hearing Exhibit 3) Mr. Sutton has represented Defendants throughout the course of this litigation, even though he has changed law firms. Defendants have also spent approximately $2 million in the defense of this action. Disqualification would not only deprive Defendants of their counsel of choice but would require the expenditure of additional fees were Defendants required to retain new counsel. There are also more subtle prejudicial effects on Defendants' litigation of this case. All of the pretrial depositions have been conducted by Fish & Richardson attorneys. Having observed witnesses to be called by Plaintiffs these attorneys are in a far better position to plan trial strategy, having seen the witnesses in person than could a lawyer limited to reviewing the deposition transcripts (See Defendants' Hearing Exhibit 34—Supplemental affidavit of Michael O. Sutton at ¶ 5).[122]

Raley & Bowick could not have terminated Wunder when the alleged conflict was raised because he left five months earlier.  There is absolutely no "reasonable probability" that any relevant confidences of Omron (which Wunder denies having) could be disclosed to Raley & Bowick.[123]   All of NOV's attorneys have submitted affidavits swearing that they have not

---

[122] *Carbo Ceramics, Inc*., 155 F.R.D. at 163-64.
[123] *Id*. at 163.

received any confidential information from Wunder.[124]  Disqualification would be a harsh and unjust holding because it would be extremely expensive for and prejudicial to NOV.[125]

Just last Thursday, the Southern District of New York considered a case where a party sought to disqualify its opponent's long-time counsel in a complex case.  The court found that the firm technically had a conflict, but refused to disqualify it because of the prejudice that would be caused to the client so late in a complex case.  The court cautioned, "<u>disqualification has an immediate adverse effect on the client by separating him from counsel of his choice</u>" and "<u>disqualification motions are often interposed for tactical reasons [a]nd even when made in the best of faith . . . inevitably cause delay. . . . Unless an attorney's conduct tends to 'taint the underlying trial,' . . . courts should be hesitant to disqualify an attorney</u>."  *HLP Properties, LLC, et al. v. Consolidated Edison Company of New York, Inc*., 1:14-cv-01383-LGS, (S.D.N.Y., 10/16/14), Doc. 115, p. 4.  The court balanced the potential harm to each party and held:

> . . . the issue of prejudice given the duration of the parties' dispute – 15 years – is critical and weighs heavily against disqualification.  <u>Gibson Dunn has represented Plaintiffs in connection with the Site since 1999</u>.  The case involves complex environmental and regulatory matters.  <u>It is doubtful, to say the least, that new counsel could acquire the knowledge accumulated over the years</u> by Gibson Dunn in the time it will take for this case to run its course. . . . Gibson Dunn's clients, the Plaintiffs in this case, have submitted <u>sworn testimony asserting that they will be severely prejudiced by loss of counsel for multiple reasons</u>, including that Gibson Dunn has already conducted numerous interviews, collected substantial data, and spearheaded the search, review and production of data – which is hosted on Gibson Dunn's server, at significant cost to Plaintiffs.
>
> <u>In contrast, Defendant identifies very modest prejudice to Defendant in the event that Gibson Dunn is not disqualified</u> – that Gibson Dunn will be unable to advise CEI on document production obligations in this case. . . .
>
> **<u>Denying Plaintiffs their chosen counsel of fifteen years is a harsh remedy</u>. Absent any identifiable, material prejudice** to Defendant and **<u>any indication</u>**

---

[124] Ex. M.
[125] Ex. T.

**that the integrity of the present legal proceedings will be compromised by Gibson Dunn's continued representation of Plaintiffs, such a remedy is not warranted.**

*Id.*, at 11 – 12(Emphasis added).

NOV would be horribly prejudiced to lose its long-time counsel in this complex patent case. Robert Bowick has been NOV's primary counsel for the AutoDriller '142 patent for **11 years**, including representing NOV in three Patent and Trademark proceedings. Raley & Bowick has extensive work product that reflects an enormous amount of expertise that will be lost if Raley & Bowick is disqualified. Such a late recusal would dramatically affect future proceedings in this case.

Nowhere in Omron's motion does it even attempt to state *how* or *why* it will be prejudiced if its motion is denied.[126]  "[A] court should not disqualify a lawyer for a disciplinary violation that has not resulted in actual prejudice to the party seeking disqualification."[127]  This failure by Omron to show any actual prejudice (because there is none), when measured against the overwhelming prejudice to NOV, is solid evidence that this motion was filed merely for tactical reasons. To reward Omron for gamesmanship would defy justice.

## V.    CONCLUSION

For Omron's theory that Wunder found and hid confidences about litigation that he never worked on to have merit, Wunder would have been required to pull off a clandestine operation rivaling a spy agency, for no apparent benefit, and lie about it later under oath. If this Court grants Omron's motion, it will be tacitly endorsing this absurd theory and encouraging lawyers to fabricate conflicts which will further congest the Court's docket, cast aspersions on the

---

[126] Motion at 8.
[127] *In re Meador*, 968 S.W.2d 346, 350 (Tex.1998) (orig.proceeding); *Pollard v. Merkel*, 114 S.W.3d 695, 698 (Tex. App.—Dallas 2003, pet. denied)(same).

profession, and deprive opponents the opportunity to select counsel of their choice.  NOV urges the Court not to allow such an unjust outcome.

Because Omron has wholly failed to meet its burden to show disqualification is appropriate and necessary, NOV respectfully asks this Court to deny Omron's motion and for any other relief under law or equity to which it is justly entitled.

Date:  October 20, 2014

Respectfully submitted,

**RALEY & BOWICK, LLP**

/s/ John W. Raley
John W. Raley
Robert M. Bowick
Bradford T. Laney
1800 Augusta Drive, Suite 300
Houston, Texas 77057
(713) 429-8050 (telephone)
(713) 429-8045 (facsimile)
JRaley@RaleyBowick.com
RBowick@RaleyBowick.com
BLaney@RaleyBowick.com

**ATTORNEYS FOR PLAINTIFF
NATIONAL OILWELL VARCO, LP**

## CERTIFICATE OF SERVICE

      The foregoing document was served via electronic case filing to all counsel of record on October 20, 2014.

**Matthew C. Powers**
Texas Bar No. 24046650
Graves, Dougherty, Hearon & Moody
401 Congress Ave., Suite 2200
Austin, TX 78701
Phone: (512) 480-5600
Fax: (512) 480-5853

**Kimberly K. Dodd**
Wisconsin Bar ID. 1044498
Foley & Lardner, LLP
777 East Wisconsin Ave.
Milwaukee, WI 53202-5306
Phone: (414) 271-2400
Fax: (414) 297-4900
Email: kdodd@foley.com

**Matthew B. Lowrie**
Foley & Lardner, LLP
111 Huntington Ave.
Boston, Massachusetts 02199
Phone: (617) 342-4000
Fax: (617) 342-4001
Email: mlowrie@foley.com

                 */s/ Bradford T. Laney*
                 Bradford T. Laney