**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

2014 NOV 14  PM 3: 03

CLER~ ~· ~
WESTER~~~~ OF TEXA~
BY_____ AD

**NATIONAL OILWELL VARCO, L.P.,**
**Plaintiff,**

-vs-                                                                         Case No.  A-12-CA-773-SS

**OMRON OILFIELD & MARINE, INC.,**
**Defendant.**

---

**O R D E R**

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Defendant Omron Oilfield & Marine, Inc.'s Motion to Disqualify Counsel [#100],

Plaintiff National Oilwell Varco, L.P.'s Response [#107], Defendant's Reply [#111], Defendant's

Letter Brief in Support of its Motion to Disqualify [#113], Plaintiff's Memorandum in Support of

its Response [#114], and Defendant's Notice of Compliance [#120].   Having considered the

documents, the file as a whole, and the governing law, the Court enters the following opinion and

order DENYING the motion.

**Background**

**I.        Procedural History of this Case**

Plaintiff National Oilwell Varco, L.P. (NOV) filed this lawsuit on August 23, 2012, asserting

Defendant Omron Oilfield & Marine, Inc. (Omron) has infringed NOV's patent (U.S. Patent No.

5,474,142 or the '142 Patent).   *See* Compl. [#1], ¶ 9.   Specifically, NOV alleged Omron's rig

automation control system having an automatic driller function infringes one or more of claims 1,

11, and 14 of the '142 Patent.   *Id.*   In addition, NOV asserted contributory and induced infringement

against Omron related to the same products and claims. *Id.*, ¶ 10. The case proceeded on a pre-*Markman* scheduling order similar to this Court's other many patent cases as the Court appointed a special master on January 4, 2013, to conduct the *Markman* hearing [#21], the special master presided over said *Markman* hearing on April 16, 2013 [#31], the special master issued his report and recommendation (R&R) on August 1, 2013 [#48], and the Court accepted the special master's R&R on August 30, 2013. In the middle of the *Markman* briefing process, Omron opened up a second front in its legal battle with NOV by filing a petition for inter partes review with the United States Patent Office (USPTO) and sought a stay of this case until the USPTO's decision on whether to grant review. *See* Def.'s Mot. Stay [#35]. The Court denied the request for stay without prejudice in an effort keep the case on track for trial. Order of June 10, 2013 [#42].

With the *Markman* order in place, the Court issued a new scheduling order [#55] on September 5, 2013, and set the parties for trial as soon as the Court's busy docket would allow: April 2015. The USPTO ultimately denied Omron's petition for inter partes review on October 31, 2013, removing that potential delay from this matter. *See* Notice of USPTO's Denial [#62]. On April 25, 2014, Omron filed its Motion to Dismiss or, in the alternative, Motion for Summary Judgment [#67], and the Court denied Omron's motion, concluding "there are factual issues that must by determined by the fact finder." *See* Order of May 29, 2014 [#78].

On July 15, 2014, NOV moved to amend its complaint. *See* Mot. Amend Compl. [#81]. NOV sought to remove claim 1—an apparatus claim—from its pleadings, leaving only claims 11 and 14—both method claims. *See id.* at 1. In so doing, NOV wanted to eliminate its burden to prove all of its patented articles are marked under 35 U.S.C. § 287(a). *See id.* Omron opposed this amendment, arguing an amendment after two years of litigation was too late. *See* Def.'s Resp. [#83].

The Court allowed the amended pleading, relying on the fact the dispositive motions deadline had yet to lapse, and trial was still approximately six months away. *See* Order of Sep. 5, 2014 [#95]. In response, Omron filed an amended answer on September 22, 2014, and around this same time asserted for the first time an "advice of counsel" defense. *See* Am. Answer [#98]. Specifically, Omron provided NOV opinions, prepared in 2006 and updated in 2011 by Omron's then-counsel with the law firm Osha Liang, which conclude NOV's '142 Patent is invalid and unenforceable (collectively, the Invalidity Opinion).[1] *See* Mot. Disqualify [#100], Ex. C (Huddleson Decl.), ¶¶ 2–3. A lawyer at Osha Liang named Lee Huddleston had originally created the Invalidity Opinion in 2006 (under the supervision of John Osha) before Huddleston updated it in 2011 in reaction to Omron's apprehension over a potential lawsuit filed by NOV against Omron (i.e., the instant lawsuit filed in this Court in August 2012). *Id.*; *see* Mot. Disqualify [#100], at 3.

By introducing the Invalidity Opinion, Omron waived the attorney–client privilege and was obligated to produce all communications related to its creation. Omron's counsel in this lawsuit (Kimberley Dodd of the law firm Foley Lardner) contacted Huddleston about gathering these communications. *See* Huddleston Decl., ¶ 4. During his review, Huddleston states he "was reminded of the fact that Brian Wunder was involved in counseling Omron regarding the NOV '142 patent-in-suit." *Id.*, ¶ 5. Huddleston further declares "Wunder was previously Of Counsel and later Partner at Osha Liang," and "[i]t is [his] understanding that [Wunder] subsequently joined the law firm of Raley & Bowick, counsel of record for NOV in this action." *Id.*, ¶ 6. On September 2, 2014,

---

[1] Omron explains it elected to disclose the Invalidity Opinion at this relatively late stage of the litigation because NOV's amended complaint re-framed the issues in the case. *See* Def.'s Reply [#111], at 13 n.10. According to Omron, by dropping apparatus claim 1, NOV narrowed this case to one solely about indirect infringement, which requires Omron to prove Omron specifically intended to induce infringement of NOV's patent. *Id.* In this context, Omron introduced the Invalidity Opinion as evidence negating this requisite intent. *Id.*

Huddleston informed Dodd that Wunder was involved in counseling Omron regarding the '142 Patent and that he subsequently joined the Raley & Bowick law firm." *Id.*, ¶ 7.

This information regarding Brian Wunder forms the foundation of the motion to disqualify confronting the Court.  Wunder is the key player, and Omron has moved to disqualify NOV's counsel (John Raley, Robert Bowick, and Bradford Laney of Raley & Bowick, LLP) based on his work while at Osha Liang and his move to Raley & Bowick.

## II.    Wunder, His Work at Osha Liang, and His Move to Raley & Bowick

Brian Wunder is an attorney with approximately thirty years of experience who joined Osha Liang as a patent litigator in 2006.  Osha Liang represented Omron on various matters relevant to this case, and it is important to distinguish three areas of work and Wunder's role in these matters.

The first category of work concerns Osha Liang's representation of Omron in a patent infringement lawsuit filed by a plaintiff named Canrig Drilling Technology, Ltd. (the Canrig Litigation).[2] In connection with the Canrig Litigation, Wunder had substantial communications with a number of Omron employees and officers.  Specifically, Wunder prepared and/or defended the depositions of Robert Bost, Dave Noethlich, Phil Martin, and Fergus Hopwood.  *See* Pl.'s Mot. Leave [#103-4], Ex. A (Wunder Depo.), at 71:9–72:23.  Based on his experience with the Canrig Litigation, Wunder testified he "certainly had confidences in [his] head about [Omron] generally, about how they do business, etc. . . . ." *Id.* at 89:1–8.

The second category of work concerns Osha Liang's representation of Omron in connection with NOV's '142 Patent. This second category breaks down into areas of work. First, there was the

---

[2]The Canrig case was filed September 16, 2009, in the Eastern District of Texas. *See Canrig Drilling Techs. Ltd. v. Omron Oilfield & Marine, Inc.*, No. 6:09-CV-414 (E.D. Tex. Aug. 5, 2011).  Wunder filed a Notice of Appearance [#40] in the case on January 25, 2010, and the case ultimately settled in or around August 2011.

Invalidity Opinion prepared by John Osha and Lee Huddleston previously discussed. Wunder did not work on this opinion, and Omron does not contend he did. *See* Wunder Depo., at 114:3–16; Mot. Disqualify [#100], at 3. Wunder did, however, know about the opinion, and he knew its conclusion. *See* Def.'s Mot. Leave [#121-2] (Wunder's Errata Page from his deposition clarifying he knew of the opinion and its conclusion but not its underlying substance). Second, Osha Liang was to give advice to Omron on a plan for addressing the potential for a lawsuit by NOV against Omron based on the '142 Patent.

The parties dispute Wunder's role in this last area of work. Omron's Vice President and General Counsel, Blake Thatcher, has provided a declaration stating Wunder "was actively involved in counseling for Omron regarding the NOV '142 patent-in-suit" as he was a patent litigator. Def.'s Mot. Disqualify [#100], Ex. A (Thatcher Decl.), ¶ 6. Thatcher claims Wunder "participated in multiple phone calls and e-mails with me and employees of Omron regarding the NOV '142 patent-in-suit," and the discussions "encompassed issues other than the opinion letters that Osha Liang prepared." *Id.*, ¶ 7. Huddleston provided a similar statement in his own declaration. *See* Huddleston Decl., ¶ 9 ("Mr. Wunder participated in multiple phone calls and e-mails with Omron and me regarding the NOV '142 patent-in-suit.").

Attached to Huddleston's declaration are some emails between Osha Liang and Omron from 2010 and 2011 regarding the '142 Patent, which Omron provided to the Court sealed. *See* Mot. Disqualify [#100-1], Ex. C-1. These emails reflect Wunder was included in discussions expressing concern about a potential lawsuit by NOV and agreement a plan should be developed in the event this lawsuit is filed. Wunder did not actively participate in the emails (he was mostly CC'ed) with

the exception of scheduling a teleconference to discuss the issue. In some of the emails, which are part of email chains, Wunder is not included at all among the recipients.

Omron, pursuant to this Court's order, also provided to the Court ex parte, under seal privileged emails, which constituted "all of the privileged communications—of which Omron is aware—between Brian Wunder and Omron containing confidential information related to Osha Liang's work on a potential lawsuit filed against Omron by [NOV]." Order of Nov. 3, 2014 [#118]. These emails provide some of the detail and substance underlying the emails already provided in Exhibit C-1. The emails involve apprehension over the '142 Patent, generalized comments on forming a plan to combat a lawsuit by NOV, and the scheduling of a teleconference to discuss these issues. Again, with the exception of helping to schedule the teleconference, Wunder did not author any emails but rather received them.

At his deposition, Wunder repeatedly testified he did not recall engaging in any substantive work or conversations regarding the '142 Patent. *See* Def.'s Mot. Leave [#121-2] (Wunder's Errata Page). While Wunder acknowledged the sealed emails in Exhibit C-1 and the fact he set up a teleconference, he did not recall any substantive conversations held in connection with these emails including the teleconference, if it occurred. Wunder Depo., at 77:7–20. Wunder indicated he diligently monitored his time in billing records, and if he worked on the '142 Patent, his billing records would reflect this work. *Id.* at 30:2–32:4. Omron has checked Osha Liang's billing records but could not locate any entries related to the '142 Patent in Wunder's records. *See* Pl.'s Mot. Leave [#103-10], Ex. I (Email from Omron's counsel).

This period of time in which Osha Liang was providing advice to Omron on a potential NOV lawsuit appears to have ended sometime in 2011. Wunder left Osha Liang in the late summer or

-6-

early fall of 2012. *See* Wunder Depo., at 10:4–6. Around this same time, NOV filed the instant lawsuit on August 23, 2012, and Omron answered October 19, 2012. *See* Answer [#9]. When Wunder left Osha Liang, he was not affiliated with any law firm until joining Raley & Bowick in mid-January 2013. *See* Wunder Depo., at 65:18–23. Neither Wunder nor anyone at Raley & Bowick formally notified anyone at Osha Liang or Omron that Wunder had joined Raley & Bowick. *Id.* at 16:4–7. When Wunder joined Raley & Bowick, he went through a conflicts check with the lawyers at the firm, and he disclosed he had represented Omron in the Canrig Litigation. *Id.* at 12:20–25. Wunder also disclosed while he had not worked on the '142 Patent, others at Osha Liang had done such work. *See* Def.'s Mot. Leave [#121-2] (Wunder's Errata Page correcting his original answer at page 88, line 9 of his deposition). The lawyers at Raley & Bowick disclosed their ongoing lawsuit on behalf of NOV against Omron, and everyone agreed Wunder would have nothing to do with the NOV lawsuit against Omron based on his work in the Canrig Litigation and the confidences he possessed. *See* Wunder Depo., at 13:1–6; 89:1–8. At no point did Wunder or anyone at Raley & Bowick approach Omron to request a waiver of conflict of interest. *See* Thatcher Decl., ¶ 8.

Once Wunder joined the firm, Raley & Bowick set up a "Chinese wall" to shield Wunder from exposure to the NOV/Omron litigation. Wunder Depo., at 13:8–15:6; Mot. Disqualify [#100], Ex. D (emails reflecting Raley & Bowick's efforts to remove Wunder from NOV/Omron email group). Wunder testified he never did any work on the NOV/Omron lawsuit while at Raley & Bowick, and he never disclosed any of Omron's confidences to the lawyers at Raley & Bowick. *Id.* at 114:21–23; 121:9–19. John Raley, Robert Bowick, and Bradford Laney each have provided an affidavit stating Wunder never worked on the NOV/Omron litigation and never disclosed any of Omron's confidential information to them. *See* Pl.'s Mot. Leave [#103-11], Ex. M (Raley Aff.), ¶¶

8–9; *id.* (Bowick Aff.), ¶¶ 8–9; *id.* (Laney Aff.), ¶¶ 9–10.  Wunder worked at Raley & Bowick from

January 2013 until the beginning of May 2014.  *See* Wunder Depo., at 27:18–23.  Then, in August

2014, Omron realized for the first time Wunder's employment at Raley & Bowick, which led to the

filing of the motion to disqualify.  *See* Thatcher Decl., ¶ 8.

## III.   Summary of the Parties' Positions

Omron's argument for disqualification is straightforward.  In short, Omron reasons Wunder

worked as Omron's attorney while at Osha Liang, and as a result, he was prohibited from taking an

adversarial position to Omron in those same matters he worked on or substantially related matters.

When Wunder moved to Raley & Bowick—who had sued Omron on behalf of NOV—Wunder's

conflict was imputed to the lawyers at Raley & Bowick.  Therefore, Wunder and the three lawyers

from Raley & Bowick should be disqualified.  Omron relies on the Texas Disciplinary Rules of

Professional Conduct (the Texas Rules) and the application of two irrebuttable presumptions: (1)

Wunder, as Omron's attorney, acquired Omron's confidences while at Osha Liang; and (2) Wunder

shared those confidences with his fellow lawyers at Raley & Bowick.

NOV argues Omron's use of the ethics rules and its motion to disqualify contradict the

purpose of those legal mechanisms, which is to preserve client confidences and prevent prejudice

against the client.  Instead, NOV contends Omron's motion—which it highlights has been filed in

the final stages of this litigation—is merely a trial tactic meant to deprive NOV of its counsel, which

has represented NOV on the '142 Patent for approximately a decade and has conducted all of the

extensive and expensive litigation and discovery in this matter over the last two years.  NOV argues

this motion has nothing to do with prejudice, and Omron has not even alleged prejudice.  Indeed,

according to NOV, this proves their point: there is no prejudice.  NOV points to the record before

the Court to argue: (1) the Canrig Litigation is unrelated to this lawsuit; (2) Wunder did no

substantive work on the '142 Patent while at Osha Liang; (3) Wunder did no work at all on the

NOV/Omron lawsuit while at Raley & Bowick; and (4) no confidences were ever shared. In sum,

NOV contends the record shows there is no prejudice to Omron, and in fact the true prejudice would

be against NOV if the Court were to disqualify its counsel.

## Analysis

### I.       Motion to Disqualify—Legal Standard

### A.       Choice of Law

"When considering motions to disqualify, courts should first look to 'the local rules

promulgated by the local court itself.'" *In re ProEducation Intern., Inc.*, 587 F.3d 296, 299 (5th Cir.

2009) (quoting *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995)). The Local Rules

of the Western District of Texas, in a section titled "Discipline of Attorneys," provide "[m]embers

of the bar of this court and any attorney permitted to practice before this court must comply with the

standards of professional conduct set out in the Texas Disciplinary Rules of Professional Conduct

. . . ." Local Rule AT-7(a).

The Fifth Circuit has made clear, however, the Texas Rules "'are not the sole authority

governing a motion to disqualify.'" *ProEducation*, 587 at 299 (quoting *In re Am. Airlines, Inc.*, 972

F.2d 605, 610 (5th Cir. 1992)); *see also In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992)

("The district court clearly erred in holding that its local rules, and thus the Texas rules, which it

adopted, are the 'sole' authority governing a motion to disqualify."). In *Dresser*, the court explained

"[m]otions to disqualify are substantive motions affecting the rights of the parties and are determined

by applying standards developed under federal law." *Id.* (citing *Woods v. Covington Cnty. Bank*, 537

F.2d 804, 810 (5th Cir. 1976)).  In contrast, "[t]he district court's authority to promulgate local rules is derived from 28 U.S.C. § 2071, which allows the courts only to adopt 'rules for the conduct of their business.'"  *Id.*  "Thus, although the district court should determine rules for the conduct of attorneys for the purpose of identifying conduct subject to sanctions, its local rules alone cannot regulate the parties' rights to counsel of their choice." *Id.*

**B.**    **Applicable Standards**

    **1.**    **The Texas Rules, the Model Rules, and their Role in this Court's Analysis**

While a motion to disqualify is a substantive motion decided under federal law, a reviewing court also "'consider[s] the motion governed by the ethical rules announced by the national profession in light of the public interest and the litigants' rights." *ProEducation*, 587 F.3d at 299 (quoting *Amer. Airlines*, 972 F.2d at 610).  In *Dresser*, the Fifth Circuit indicated its "precedents have applied the ethical canons contained in the ABA [American Bar Association] Model Code." *Amer. Airlines*, 972 F.2d at 610 (citing *Dresser*, 972 F.2d at 943).  Therefore, the Court considers both the Texas Rules and the ABA's Model Rules.

Texas Rule 1.09 states:

    (a)    Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

        (1)    in which such other person questions the validity of the lawyer's services or work product for the former client;

        (2)    if the representation in reasonable probability will involve a violation of Rule 1.05 [dealing with confidential client information]; or

        (3)    if it is the same or a substantially related matter.

(b)    Except to the extent authorized by Rule 1.10, when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a).

(c)    When the association of a lawyer with a firm has terminated, the lawyers who were then associated with that lawyer shall not knowingly represent a client if the lawyer whose association with that firm has terminated would be prohibited from doing so by paragraph (a)(1) or if the representation in reasonable probability will involve a violation of Rule 1.05.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, art. 10, § 9 (Vernon 2005).[3]

The relevant ABA Model Rule, Rule 1.9(b), has some "linguistic differences" from Texas Rule 1.09, but regardless, "the two codes produce the same result in application—they both require that a departing lawyer must have actually acquired confidential information about the former firm's client or personally represented the former client to remain under imputed disqualification." *ProEducation*, 587 F.3d at 301. In *Dresser*, the Fifth Circuit stated "[o]ur source for the standards of the profession have been the canons of ethics developed by the [ABA]," and "[o]ur most far-reaching application of the national standards of attorney conduct to an attorney's obligation to avoid conflicts of interest is *Woods v. Covington Cnty. Bank* . . . ." *Dresser*, 972 F.2d at 543.

In *Woods*, the court held "standards such as ABA canons are useful guides but are not controlling in adjudicating such motions." *Id.* at 543–44 (citing *Woods*, 537 F.2d at 804). Whether it be the Texas Rules or the Model Rules, the Fifth Circuit has stated "inflexible application of a professional rule is inappropriate because frequently it would abrogate important societal rights, such as the right of party to his counsel of choice and an attorney's right to freely practice her profession."

---

[3]The current version of the Texas Rules became effective January 1, 1990. *See ProEducation*, 587 F.3d at 300 n.2 (citing *Clarke v. Ruffino*, 819 S.W.2d 947, 949 (Tex. App.—Hous. [14th Dist.] 1991, writ dism'd w.o.j.)).

*U.S. Fire*, 50 F.3d at 1314 (citing *Woods*, 537 F.2d at 813).  For instance, societal rights considered and balanced in *Woods* were whether a conflict has (1) the appearance of impropriety in general or (2) a reasonable possibility that a specific impropriety has occurred, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case.  *Dresser*, 972 F.2d at 543 (citing *Woods*, 537 F.2d at 812–13).

The Fifth Circuit has made clear: "'The rule of disqualification is not mechanically applied in this Circuit.'"  *U.S. Fire*, 50 F.3d at 1314 (quoting *Church of Scientology of Ca. v. McLean*, 615 F.2d 691, 693 (5th Cir. 1980)).  Relatedly, "[a]ll of the facts particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights."  *Id.*

### 2.  The Substantial Relationship Test and Whether there is an Irrebutable Presumption a Lawyer Acquires the Confidences of his Client

Focusing on Fifth Circuit precedents, cases involving prior representations have been governed by the "substantial relationship" test.  *See Am. Airlines*, 972 F.2d at 614.  This test instructs:

> A party seeking to disqualify opposing counsel on the ground of a former representation must establish two elements: (1) an actual attorney–client relationship between the moving party and the attorney he seeks to disqualify and (2) a substantial relationship between the subject matter of the former and present representations.

*Id.* (citing *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1341, 1345 (5th Cir. 1981); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1028 (5th Cir. 1981)).  The party seeking

disqualification bears the burden of proving the present and prior representations are substantially related. *See id.* (citing *Duncan*, 646 F.2d at 1028).

"Once it is established that the prior matters are substantially related to the present case, 'the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation.'" *Id.* (quoting *Duncan*, 646 F.2d at 1028; *Corrugated Container*, 659 F.2d at 1347). While the test is categorical in requiring disqualification upon satisfaction of the substantial relationship standard, it should not be applied "in a mechanical way that might 'prevent[] an attorney from ever representing an interest adverse to that of a former client.'" *Id.* (citing *Duncan*, 646 F.2d 1027–28). "Rather, a substantial relationship may be found only after 'the moving party delineates with specificity the subject matters, issues and causes of action' common to prior and current representations and the court engages in a 'painstaking analysis of the facts and precise application of precedent.'" *Id.* (citing *Duncan*, 646 F.2d at 1029) (internal quotation omitted)).

3.      **Imputation and Whether there is an Irrebuttable Presumption a Lawyer Shares Acquired Confidences with other Lawyers at his Law Firm**

There is a second presumption relied upon by Omron, which forms an integral component of its motion. The presumption is a lawyer in possession of client confidences shares those confidences with other lawyers at his firm. *See, e.g., Corrugated Container*, 658 F.2d at 1346–47. The Fifth Circuit, however, has not specifically adopted this irrebuttable presumption.[4] Omron

---

[4]In contrast, the Texas Supreme Court has clearly held this presumption of shared confidences applies and is irrebuttable. *See, e.g., In re Columbia Valley Healthcare Sys., L.P.*, 320 S.W.3d 819, 824 (Tex. 2010) ("When the lawyer moves to another firm and the second firm is representing an opposing party in ongoing litigation, [an] irrebuttable presumption arises . . . that the lawyer will share the confidences with members of the second firm, requiring imputed disqualification of the firm."). As explained above, however, the instant motion to disqualify is a substantive motion under federal law, and this Court, while it considers the Texas Rules and Texas case law as guidance, looks to Fifth Circuit precedent as controlling authority.

suggests the Fifth Circuit, in *American Airlines*, established this irrebuttable presumption as part of the "controlling framework" on disqualification motions.  *See* Def.'s Letter Brief [#113], at 1.  The Court disagrees with this legal contention for three main reasons.

First, in *American Airlines*, the court, in a footnote, mentioned the second irrebuttable presumption "that confidences obtained by an individual lawyer will be shared with the other members of his firm," but stated "[t]his presumption [of shared confidences] is not at issue in this case . . . ."  *Am. Airlines*, 972 F.2d at 614 n.1 (citing *Corrugated Container*, 659 F.2d at 1346).  As the Fifth Circuit pointed out in *ProEducation*, "the *American Airlines* case did not actually involve or apply this presumption, so any statements regarding the presumption are dicta."  *ProEducation*, 587 F.3d at 303.

Second, the *American Airlines* court, in referencing the second irrebuttable presumption, cited *Corrugated Container*, but this latter case does not establish an inflexible application of this irrebuttable presumption irrespective of the facts.  In *Corrugated Container*, the court addressed "a question not decided before in this circuit, to wit, whether the presumptions that arise under the substantial relationship test are rebuttable."  *Corrugated Container*, 659 F.2d at 1346.  Regarding the first presumption, the court concluded it was irrebuttable.  *See id.* at 1347.[5]  Concerning the

---

[5]The court's reasoning for making this first presumption (i.e., that confidences potentially damaging to the client have been disclosed to the attorney) irrebuttable was as follows:

> [I]t is evident that the presumption arising under the substantial relationship test is not the ordinary type of presumption that is intended to obviate the need for proof where proof would be difficult. Instead, this presumption is intended to prevent proof that would be improper to make.  The presumption avoids compelling the former client to prove the very things that he seeks to keep confidential.  If the presumption were rebuttable, that is, if the attorney could attempt to prove that he did not recall any disclosure of confidential information, or that no confidential information was in fact disclosed, this could also defeat the purpose of keeping the client's secrets confidential.  The confidences would be disclosed during the course of rebutting the presumption by the attorney, or if the presumption was considered rebutted, the client might again be put into the anomolous position of having to show what confidences he entrusted to his attorney in order to prevent those confidences

second presumption, the court noted "this circuit has exhibited reluctance to apply the latter presumption repeatedly to disqualify new partners of an attorney vicariously disqualified by virtue of his former partners' representing certain clients." *Id.* at 1346 (citing *Am. Can Co. v. Citrus Feed Co.*, 436 F.2d 1125, 1129 (5th Cir. 1971)). Nevertheless, "[w]hile this presumption of imputed knowledge may be unduly harsh in some circumstances, it is not here." *Id.* Evaluating these circumstances of the case, the court concluded: "Among partners and regarding a longtime substantial client, this single-imputation rule cannot be rebutted." *Id.* at 1347.[6] In other words, the court implied an irrebuttable presumption of imputed knowledge would be unduly harsh in some circumstances depending on the facts.

Third, the Fifth Circuit in *ProEducation* indicated, at least to some extent, the court's decision in *American Airlines* was altered by the changes to the Texas Rules in 1990. The court explained the *American Airlines* court relied on decisions (*Corrugated Container* and *American Can Co.*) which "applied a superseded version of the Texas Rules. The addition of Comment 7 in 1990 changed the landscape of the jurisprudence and gave migrating attorneys the opportunity to remove

---

from being revealed. We conclude the presumption of disclosure is not susceptible of rebuttal by proof.

*Corrugated Container*, 659 F.2d at 1347 (citations omitted).

[6]The "circumstances" in *Corrugated Container* involved a law firm (the Chadwell Firm) which had an attorney–client relationship with a client, Kraft, evidenced by: (1) over fifty years of work together; (2) Chadwell's role as Kraft's general counsel for most of those years; (3) in the approximately six years preceding the case, approximately 40,000 hours of work, 26,000 of which were for antitrust matters, billed to Kraft by the Chadwell Firm and over $2 million in legal fees paid by Kraft to the Chadwell Firm; (4) close personal relationships persisting between many lawyers at the Chadwell Firm and Kraft; and (5) all but two of the lawyers at the Chadwell Firm having done some form of legal work for Kraft. *See Corrugated Container*, 659 F.3d at 1345, 1343. When the Chadwell Firm sought to represent a party adverse to Kraft in an antitrust matter, the court automatically imputed the knowledge of those partners who had worked most closely with Kraft (and who had since left the firm) to the those partners remaining in the firm. *Id.* at 1346–47. Considering the substantial and longtime relationship, the court reasoned this sort of imputation "presumes only that which makes lawyers associate themselves in a shared practice of their profession." *Id.* at 1347. The court disqualified the Chadwell Firm. *Id.* at 1349.

imputed disqualification." *ProEducation*, 587 F.3d 296, 304. The court further noted, with respect to the irrebuttable presumption referenced in *American Airlines*, "that confidences obtained by an individual lawyer will be shared with other member of the firm," that "[i]t is unclear whether a rebuttable presumption replaces the *American Airlines* irrebuttable presumption, or whether no presumption remains." *Id.* at 303, 304 n.7. Based on the facts of the case, the court did not answer this open question. *Id.* at 304 n.7. In other words, at a minimum, the presumption that confidences are shared among lawyers at a law firm is rebuttable, and there may be no such presumption at all.

   *ProEducation* from 2009 is the most recent Fifth Circuit case discussed by the parties in their briefs and merits close attention. The case involved a bankruptcy associate (Kennedy) at a large law firm, and while he worked at the firm, a fellow bankruptcy attorney (Schooler) at the firm represented a creditor in a bankruptcy proceeding. *Id.* at 297. Kennedy subsequently left the firm to take an in-house, general counsel position, and in that capacity he sought to represent another creditor in the same bankruptcy proceeding. *Id.* at 298. Schooler's creditor client and Kennedy's creditor client had adverse interests in the proceeding, and Schooler sought to disqualify Kennedy on behalf of his client on the ground of imputed conflict of interest. *Id.* The bankruptcy court, relying on *American Airlines* and *Corrugated Container*, applied two irrebuttable presumptions: (1) "confidential information has been given to the attorney actually doing work for the client" (i.e., Schooler obtained confidences in his representation of his creditor client); and (2) "confidences obtained by an individual lawyer will be shared with the other members of his firm" (i.e., Schooler shared those confidences with Kennedy). *Id.* The bankruptcy court did not allow Kennedy to rebut the second presumption and disqualified Kennedy. *Id.*

-16-

After reviewing the Texas Rules, the Model Rules, and submitted expert reports, the Fifth Circuit concluded the bankruptcy court erred in not considering Kennedy's evidence of his lack of involvement with Schooler's client while at the law firm. *Id.* at 300–03. The Fifth Circuit reviewed that evidence and found Kennedy did no work for this client and never acquired any confidences. *Id.* at 303. In so doing, as explained above, the court rejected the applicability of the irrebuttable presumption lawyers at a law firm share confidences referenced in *American Airlines. Id.* at 303–04. The Fifth Circuit reversed the district court's judgment affirming the bankruptcy court's order disqualifying Kennedy. *Id.* at 304.

In sum, under Fifth Circuit precedent, there is no established irrebuttable presumption a lawyer shares client confidences he possesses with other lawyers at his law firm. On the other hand, the Fifth Circuit has indicated in recent precedent, *ProEducation*, that, to the extent there is still a presumption (which itself the *ProEducation* court called into question), the presumption is rebuttable.

## II.    Application

Having laid out the relevant legal framework, the Court now turns to the merits of this case.

## A.    Waiver

As a preliminary matter, the Court accepts Omron was unaware of Wunder's employment with Raley & Bowick until August 2014 when, after Kimberley Dodd contacted Lee Huddleston regarding communications about the Invalidity Opinion, Omron connected the dots and realized the potential conflict. While Wunder's employment with Raley & Bowick was not a secret and could have been discovered sooner, there is no reason Omron should have discovered this fact sooner.

NOV makes a variety of waiver arguments, essentially urging Omron should have raised the conflict sooner, but the Court rejects these arguments.

First, NOV argues Wunder, upon joining Raley & Bowick, sent an email to a group of lawyers, which included a lawyer from Osha Liang named Louis Bonham, notifying them of his new employment with Raley & Bowick, and therefore Omron, through imputation, had knowledge of this fact. *See* Pl.'s Resp. [#103-12], Ex. N. This email, however, was addressed to another lawyer (Bonham was CC'ed), and it related to an entirely separate matter in the Southern District of Texas. *Id.* In addition, Bonham was a member of the trial team in the Canrig Litigation, but he was not included in the group emails regarding the '142 Patent provided to the Court under seal (both privileged and non-privileged). *See* Def.'s Mot. Leave [#121-2] (Wunder's Errata Page from his deposition correcting his answer at 90:22–24 to state Bonham was a member of the Canrig trial team). Moreover, the email was sent in February 2013 when Osha Liang was not representing Omron on either the Canrig case or the NOV case. NOV suggests Osha Liang continued to represent Omron until September 2013 in front of the USPTO, but there is no indication Bonham was involved with that representation. *See* Pl.'s Resp. [#103-13], Ex. O. In short, Wunder's email to Bonham was not a matter within the scope of Bonham's authority for or representation of Omron. *See McMahan v. Greenwood*, 108 S.W.3d 467, 481 (Tex. App.—Hous. [14th] Dist. 2003, pet. denied) (imputing "knowledge acquired by an attorney . . . while acting in the scope of his or her authority").

Second, NOV argues Omron and its attorneys incurred various duties throughout the discovery process to produce the Invalidity Opinion, and if they had done so as they should have, they would have learned of these conflict documents sooner. *See* Pl.'s Resp. [#103-2], at 32 (citing various initial disclosures and discovery requests). NOV provides no legal support for these

-18-

supposed duties, and the argument is baseless. Omron had exclusive control over whether to retain privilege over its Invalidity Opinion or instead assert it as part of its defense. Also, Omron's decision to assert the Invalidity Opinion late in the litigation was in direct response to NOV's decision to amend its complaint.

The Court notes NOV's two primary waiver arguments are attempts to shine the spotlight on Omron as the party responsible for this conflict of interest problem emerging as late in this lawsuit as it has when the blame, if anywhere, lies squarely on the attorneys at Raley & Bowick and Wunder. If Wunder had notified his previous firm of his new employment or if Raley & Bowick had sought a conflict of interest waiver from Omron upon hiring Wunder, this entire dispute could have been nipped in the bud. These lawyers have no good answers for why they did not take these simple actions. While Raley & Bowick claim they saw no conflict, they certainly could have seen, at a minimum, a potential conflict, making a waiver request at the outset the prudent move. This mistake, however, does not automatically result in disqualification, and the Court now addresses the merits of Omron's motion.

## B.      Omron's Three Grounds for Disqualification

Omron has asserted three distinct grounds for disqualification, and the Court addresses each in turn.

### 1.      Ground One

First, Omron argues the Raley & Bowick attorneys should be disqualified under a combination of Texas Rules 1.09(a)(3) and 1.09(b) based on Wunder's work for Omron on a

potential NOV lawsuit while at Osha Liang.  *See* Mot. Disqualify [#100], at 4–6, 7–9.[7]

### a.  First Step: The Substantial Relationship Test and the First Irrebuttable Presumption of Acquired Confidences

Specifically, Omron contends Wunder worked for Omron while at Osha Liang to give advice on a plan for addressing the potential for a lawsuit by NOV based on the '142 Patent.[8]  As a result, Wunder would be prohibited from switching sides and representing NOV in the lawsuit filed in this Court by Texas Rule 1.09(a)(3).  The analog for Texas Rule 1.09(3) under Fifth Circuit case law is the substantial relationship test; indeed, "the [Texas] Rules did not supplant, but adopted, the common law substantial relationship test."  *Am. Airlines*, 972 F.2d at 617.  Under this two-pronged test, Omron must establish (1) an actual attorney–client relationship between Omron and Wunder, and (2) a substantial relationship between the subject matter of the former and present representations.

In this instance, Omron easily satisfies the second element.  The "former" representation involved advice sought in 2010 and 2011 on a potential lawsuit by NOV, and the "present"

---

[7]NOV disputes Omron's reliance on Texas Rule 1.09(a)(3) and instead argues the applicable rule is Texas Rule 1.09(c) because Wunder has left the Raley & Bowick firm.  *See* Pl.'s Resp. [#103-2], at 18.  As the Court reads Texas Rule 1.09 and the accompanying comments, 1.09(c) would apply to this case if Raley & Bowick were seeking to initiate representation of NOV after Wunder had left their firm.  Wunder, however, worked at Raley & Bowick during the firm's representation of NOV, although he has since left the firm.  These circumstances implicate Texas Rule 1.09(a)(3), not Texas Rule 1.09(c).

[8]As discussed above in Part II of the Background section, there are two categories of work involved: (1) Osha Liang's work for Omron on the Canrig Litigation; and (2) Osha Liang's work for Omron relating to NOV's '142 Patent.  The first category is discussed further below.  The second category breaks down into two sub-areas: (1) work on the Invalidity Opinion; and (2) more generally, advice on a potential lawsuit.  Omron's Ground One for disqualification is based on this latter area of work.  The Court does not address the first area of work as a ground for disqualification as Omron has not so moved.  This decision by Omron makes sense because both sides appear to agree Wunder did not work on the Invalidity Opinion.  Moreover, Omron has produced (albeit only recently) the Invalidity Opinion to NOV in this case as part of its "advice of counsel" defense.  Consequently, any argument Wunder (and through imputation, Raley & Bowick) should be disqualified predicated on confidences Wunder acquired in working on the Invalidity Opinion would hold little water given its introduction by Omron into the case.  In other words, Omron has waived the attorney–client privilege regarding the Invalidity Opinion and related communications.

representation is this very lawsuit filed in August 2012.  As for the first element, the Court finds Omron has satisfied its burden.  NOV focuses in its briefing and in its questioning at Wunder's deposition on whether Wunder performed any work on the '142 Patent, whether he ever analyzed its claims, whether he looked at the prior art, and so forth.  The question, however, is not whether Wunder actually performed work on the '142 Patent, substantive or peripheral, while at Osha Liang; rather, the question is whether there was an attorney–client relationship between Omron and Wunder.  The emails provided both in sealed Exhibit C-1 to the motion to disqualify [#101-1] and in the sealed, ex parte exhibits attached to the Notice of Compliance [#120] demonstrate Wunder and Omron had an attorney–client relationship regarding a potential lawsuit by NOV.  In summary, these emails reveal Wunder was privy to confidential discussions about a potential lawsuit, and he actively set up a meeting himself to discuss the litigation strategy.

Having satisfied the substantial relationship test, the Court, following *American Airlines*, irrebuttably presumes Wunder acquired confidential information.  And while one purpose of the irrebuttable presumption is to eliminate the need for the Court to examine a factual record on this point, the Court notes the factual record before it shows Wunder was indeed exposed to confidential information.  At this point, the Court further notes Wunder, if he were the lawyer representing NOV and the subject of the instant motion, would be disqualified.  The important question for the Court now, however, is whether Wunder's conflict should be imputed to the lawyers of Raley & Bowick.

**b.      Second Step: Effect of Wunder's Conflict on Raley & Bowick**

Omron next asks the Court to apply a second irrebuttable presumption Wunder shared Omron's confidences with the lawyers at Raley & Bowick when he joined their firm, but, as previously discussed, that is not the law in this circuit.  Moreover, to apply such a presumption

irrebuttably would result in a mechanical application of the rule of disqualification and an inflexible application of a professional rule (in this case, Texas Rule 1.09(b)). Instead, the Court, following *ProEducation*[9] and *Corrugated Container*,[10] concludes NOV, under the circumstances present in this case, should be given a chance to rebut any presumption Wunder shared Omron's confidences with the lawyers at Raley & Bowick based on the factual record. In addition to consideration of the facts, the Court finds a balancing approach to be the most prudent under Fifth Circuit guidance as a whole. *See U.S. Fire*, 50 F.3d at 1313; *Cossette v. Country Style Donuts, Inc.*, 647 F.2d 526, 530 (5th Cir. 1981), *disavowed on other grounds by Gibbs v. Paluk*, 742 F.2d 181, 185 (5th Cir. 1984); *Woods*, 537 F.2d at 812–13.

By closely analyzing the facts and considering equitable factors, the Court's approach aligns with the case cited by the parties with the most similar fact pattern to this case. *See In re DataTreasury Corp.*, No. 2010-M928, 2010 WL 3074395 (Fed. Cir. Aug. 5, 2010) (unpublished). In *DataTreasury*, the Federal Circuit denied a writ of mandamus, which would have directed the Eastern District of Texas to disqualify the defendant's law firm. *Id.* at *1. The case involved a

---

[9]The Court recognizes the facts of *ProEducation* were not the same as those in this case. As discussed in Part I(B)(3) of this Analysis section, the lawyer in *ProEducation* permitted to rebut the presumption of shared confidences was also the migrating attorney, and he sought to undertake the representation at issue after he had already left his previous firm. In this case, the lawyers at Raley & Bowick are the ones rebutting the presumption, but Wunder is the migrating attorney. In addition, the lawyers at Raley & Bowick are not seeking to initiate a representation because they already represented NOV while Wunder was an employee of their firm. Despite these differences, the Court still finds *ProEducation* is consistent with allowing the lawyers at Raley & Bowick to rebut the presumption, if there is one, under the circumstances of this case. Conversely, *ProEducation* does not support Omron's position that there is an irrebuttable presumption of shared confidences under Fifth Circuit law.

[10]Comparing the circumstances of *Corrugated Container* to those in this case, the Court concludes applying an irrebuttable presumption would be "unduly harsh" as the *Corrugated Container* court suggested it might be in certain cases. Unlike the extensive attorney–client relationship lasting five decades between Kraft and the Chadwell Firm, Wunder worked on one case for Omron (the Canrig Litigation) and participated on discussions providing advice to Omron on a potential lawsuit by NOV. Furthermore, the lawyers disqualified by imputation in *Corrugated Container* were other lawyers at the Chadwell Firm who had not done extensive work for Kraft. In contrast, Raley & Bowick is a different firm from Osha Liang where Wunder actually represented Omron.

-22-

lawyer, De Stefano, who had years earlier briefly represented the plaintiff, DataTreasury, in negotiating a license agreement on a certain patent. *Id.* The representation was so brief De Stefano had not even billed DataTreasury for his time. *Id.* Later De Stefano joined another firm, Fish & Richardson, which represented the defendant, Bank of America, against DataTreasury in a patent infringement lawsuit on the exact same patent as the one for which De Stefano helped negotiate a license. *Id.* De Stefano was with Fish & Richardson when DataTreasury sued Bank of America but had since left the firm. *Id.* DataTreasury moved to disqualify De Stefano and the Fish & Richardson law firm. *Id.* The district court found, despite the limited work De Stefano performed for DataTreasury, an attorney–client relationship existed, and the prior and current matters were substantially related. *Id.* Consequently, De Stefano was disqualified from representing Bank of America under the substantial relationship test. *Id.* The district court, however, did not similarly disqualify Fish & Richardson based on the imputation of De Stefano's conflict and instead applied a balancing approach under Fifth Circuit law. *Id.* The court reviewed the costs and benefits of disqualifying the firm and considered the following factors: (1) the fact Fish & Richardson had been working on the case for four years and had "singular familiarity with the issues in the case;" (2) the cost of retaining new counsel would be substantial both in money and time; (3) De Stefano's limited representation of DataTreasury; and (4) Bank of America's potential loss of its right to counsel of its choice. *Id.* On balance, the court found DataTreasury had failed to show any harm it might suffer outweighed the harm Bank of America would incur if Fish & Richardson were disqualified. *Id.*

On appeal to the Federal Circuit, DataTreasury contended the district court had erred by not applying an irrebuttable presumption De Stefano had shared his confidences with the lawyers at Fish & Richardson under *American Airlines*. *Id.* at *2. The Federal Circuit, though, agreed with the

district court's conclusion that *American Airlines* only discussed the irrebuttable presumption of shared confidences in dicta. *Id.* DataTreasury also objected to the district court's use of a balancing approach and argued *American Airlines* instructs categorical disqualification upon establishment of a substantial relationship. *Id.* The Federal Circuit found DataTreasury's arguments failed to establish a clear and indisputable right to mandamus relief, pointing out "the Fifth Circuit has on multiple occasions conducted a similar balancing analysis after reaching the conclusion that the substantial relationship test had been met." *Id.* (citing *Corrugated Container*, 659 F.2d at 1348; *United States v. Kitchin*, 592 F.2d 900 (5th Cir. 1979)). The Federal Circuit acknowledged *Corrugated Container* was decided pre-*American Airlines* and was based on the now defunct "appearance of impropriety" ethics canon, but *American Airlines*'s reasoning still supported its continued viability. *Id.*

With these legal precedents in mind, the Court turns its attention to the instant matter. The Court first considers the facts, and the record before the Court is simple, although limited. Wunder testified in his deposition under oath that, with the exception of the initial conflicts check conversation, he never discussed NOV or the '142 Patent with any of the lawyers at Raley & Bowick, and he never disclosed any confidential information he gained in his representation of Omron to the lawyers at Raley & Bowick. Similarly, the three lawyers at Raley & Bowick all provided affidavits under oath stating, with the exception of the conflict check, Wunder never worked on the NOV/Omron matter at their firm, they never discussed the case with Wunder, and Wunder never disclosed to them any of Omron's confidential information. In addition, there is evidence the firm set up a Chinese wall to screen Wunder from any correspondence or discussion

-24-

regarding the NOV/Omron lawsuit.[11]  Finally, Wunder left the Raley & Bowick firm in May 2014, so there is no ongoing risk of future disclosure.  On the one hand, the Court recognizes this is, unsurprisingly, a one-sided record; Omron's task in disputing this factual record is extremely difficult as Wunder and the lawyers (and employees) of Raley & Bowick are the ones with all of the relevant information and knowledge.  On the other hand, to question this factual record would essentially amount to concluding these four lawyers are lying under oath as part of a conspiracy.  Fully aware of these competing factors, the Court does not accept this factual record as dispositive, but it does consider it as part of the balancing approach.  In sum, the factual record does indicate Wunder never worked on the NOV/Omron lawsuit while at Raley & Bowick nor shared any of Omron's confidences with the attorneys at Raley & Bowick.

In addition to the factual record, the Court weighs equitable factors.  This case was filed more than two years ago, has traversed the intensive *Markman* process, has made a stop at the USPTO on a petition for inter partes review, and returned to this Court where the parties have engaged in lengthy discovery, which is nearly complete as trial soon approaches in April 2015.  To disqualify NOV's counsel and have it hire new counsel at this juncture would almost certainly result in yet further delay and inefficient resolution of this lawsuit.  As a preview, the Court's docket is currently completely booked, including patents cases, through July 2016.  If NOV's new counsel were unable to acclimate themselves to this complicated, high-stakes lawsuit in time to present it to a jury in April 2015, then a continuance would mean a trial in late 2016 at the earliest.

---

[11]Under Texas law, efforts to screen conflicted attorneys through mechanisms like "Chinese walls" cannot rebut the presumption of shared confidences among lawyers. *See Columbia Valley*, 320 S.W.3d at 824; *Petroleum Wholesale, Inc. v. Marshall*, 751 S.W.2d 295, 300 (Tex. App.—Dallas 1988, no writ). Indeed, as already explained, the presumption of shared confidences is irrebuttable under Texas law.  The same is not true of Fifth Circuit law, and the Court considers these efforts to screen Wunder from the NOV/Omron litigation as part of the factual record.

Relatedly, the lawyers at Raley & Bowick are singularly familiar with the issues of this case as they have worked this matter since they filed the complaint, which they did before Wunder ever joined their firm. Moreover, John Raley has represented NOV since at least November 2006 in litigation for infringement of the '142 Patent. *See* Raley Aff., ¶ 4. Robert Bowick has represented NOV and its predecessor companies since at least 2003 in litigation for infringement of the '142 Patent. *See* Bowick Aff., ¶ 4. One of NOV's in-house attorneys states the Raley & Bowick law firm has represented NOV in all United States litigation matters over the infringement of the '142 Patent, and Bowick has further represented NOV in several USPTO proceedings relating to the '142 Patent. *See* Mot. Leave [#103-17], Ex. T (Creaven Aff.), ¶ 7. To remove these lawyers as counsel would work significant prejudice against NOV. The lawyers NOV would have to hire to replace Raley & Bowick would unlikely be able to acquire the intimate and thorough knowledge its current counsel have gained over the course of many years and lawsuits. In attempting to do so, these newly-hired lawyers would inevitably rack up substantial legal fees, and NOV indicates it would cost it "hundreds of thousands of dollars" if the Court disqualifies Raley & Bowick. Creaven Aff., ¶ 8. NOV's potential loss of its right to counsel weighs heavily against disqualification.

Furthermore, Omron has failed to explain to the Court the harm which could result from the confidential information at issue. Wunder acknowledged in his deposition he was aware of an Invalidity Opinion, and he knew its conclusion. But the Invalidity Opinions are now in the case, and Omron has waived the attorney–client privilege concerning the opinions and related communications.[12] The emails provided to the Court demonstrate Wunder was exposed to

---

[12] The Court acknowledges the Invalidity Opinion was only recently produced by Omron to NOV, and it was not made available to NOV during the time of Wunder's employment with Raley & Bowick. Nevertheless, the Court does not see the harm considering the opinion was ultimately put at issue by Omron, and Omron does not explain to the

confidential discussions regarding a potential NOV lawsuit, and Wunder scheduled a meeting to discuss litigation strategies and defenses.[13] By the time Wunder joined Raley & Bowick, however, NOV had already sued Omron, and Omron had already answered. The Court does not see how any of the confidential information contained in these emails could be shared by Wunder with the Raley & Bowick attorneys and result in harm to Omron. Omron does explain one example when it argues Wunder's mere disclosure of the fact lawyers at Osha Liang had performed work with respect to the '142 Patent during his initial conflicts check with Raley & Bowick was a disclosure of confidential information. Yet Omron does not take the next step and tell the Court what harm could come of this revelation.

Omron simply never explains to the Court which specific piece of confidential information could lead to what specific harm. The Court does not rule out the possibility this confidential information could result in prejudice to Omron mostly because the Court has no idea what the evidence will be at trial and how these issues might emerge. But it is Omron's burden to show why disqualification, a severe remedy, is called for in these circumstances, and Omron does not even suggest what harm might occur. On the other hand, the harm to NOV as a consequence of disqualification is sure and significant.

Accordingly, the Court denies Omron's Ground One as a basis for disqualification of the lawyers at Raley & Bowick.

-------

Court any such harm.

[13]The Court also notes while the emails certainly demonstrate Wunder was exposed to confidential discussions, his role was mostly as a passive recipient as he was CC'ed onto emails with multiple other individuals. In addition, Omron's review of Osha Liang's billing records turned up no entries by Wunder for work done on the potential NOV case. In other words, Wunder's role in providing advice regarding a potential lawsuit appears to have been quite limited.

## 2.    Ground Two

Second, Omron argues the Raley & Bowick attorneys should be disqualified under a combination of Texas Rules 1.09(a)(2) and 1.09(b) based on Wunder's work for Omron on a potential NOV lawsuit while at Osha Liang. *See* Mot. Disqualify [#100], at 6–9.

This second ground does not implicate the substantial relationship test and the related applicability of irrebuttable presumptions. Texas Rule 1.09(a)(2) bars representation of another party in a matter adverse to a former client "if the representation in reasonable probability will involve a violation of Rule 1.05." Texas Rule 1.05 prohibits an attorney from disclosing a client's confidential information to others. Although not clearly explained, the Court presumes Omron's argument consists of the following two steps. First, Wunder would be barred from representing NOV because he has previously represented Omron, and representing NOV would in reasonable probability involve Wunder's disclosure of Omron's confidential information in violation of Texas Rule 1.09(a)(2). Second, the lawyers at Raley & Bowick would be barred from representing NOV under Texas Rules 1.09(b) because Wunder was barred by Texas Rule 1.09(a)(2).

Again, Omron's argument is premised on a rigid application of the ethics rules, but the Fifth Circuit instructs courts against this approach. Moreover, Omron does not even satisfy its burden on the two steps of this argument. First, the parties do not discuss in their briefs whether a hypothetical involving Wunder's representation of NOV would "in reasonable probability" involve disclosure of Omron's confidential information. The emails provided to the Court show Wunder was certainly exposed to Omron's confidential information, but the Court is at a loss to determine whether Wunder's hypothetical representation of NOV would in reasonable probability entail disclosure of this information. Therefore, the Court concludes Omron has failed to satisfy the first step of the

argument, a violation of Texas Rule 1.09(a)(2). Without satisfying the first step, Omron cannot satisfy the second step.

Accordingly, the Court denies Omron's second ground for disqualification.

### 3.     Ground Three

Third, Omron argues the Raley & Bowick attorneys should be disqualified under a combination of Texas Rules 1.09(a)(3) and 1.09(b) based on Wunder's work for Omron in the Canrig Litigation while at Osha Liang. *See* Mot. Disqualify [#100], at 7 n.6, 7–9.

### a.     First Step: The Substantial Relationship Test and the First Irrebuttable Presumption of Acquired Confidences

The Court proceeds through the same analysis in Ground Three as it did in Ground One, and in this instance, Omron can easily satisfy the first prong of the substantial relationship test because the parties do not dispute Wunder represented Omron in the Canrig Litigation. The question is whether there is a substantial relationship between the subject matter of the Canrig representation and the present representation. Omron has the burden to specifically delineate the matters, issues, and causes of action common to these two representations, and the Court then engages in a painstaking analysis of the facts and precise application of precedent. *See Am. Airlines*, 972 F.2d at 614 (citing *Duncan*, 646 F.2d at 1029) (internal quotation omitted)).

Omron asserts the following common factors between the Canrig Litigation and the instant NOV lawsuit: (1) they both involve patent infringement claims asserted against Omron; (2) they both involve allegations of willful infringement; (3) they both involve Omron's rig control system as the accused instrumentality; and (4) they involve some of the same witnesses (Robert Bost, Dave Noethlich, Fergus Hopwood, and Phil Martin). *See* Mot. Disqualify [#100], at 7 n.6. In addition,

Omron points to Wunder's deposition testimony in which he stated that in the course of representing Omron in the Canrig Litigation, he built personal friendships with the Omron officers at issue, he had confidences in his head about how they did business, and as a result he thought it was important to stay as far away as possible from the NOV/Omron lawsuit to avoid the appearance of impropriety. Wunder Depo., at 89:1–8. Wunder also stated while the Canrig Litigation involved a different patent, the two cases concerned the same control system, and because he had knowledge of this control system, he wanted to be isolated from the NOV/Omron case. *Id.*, at 20:3–21.

NOV counters by arguing Omron has admitted in various discovery responses the technology at issue in the Canrig Litigation was irrelevant to the technology at issue in the '142 Patent. *See* Pl.'s Resp. [#103], at 30 n.101. NOV also points out the patent examiner in reviewing the patent at issue in the Canrig Litigation never referenced the '142 Patent. *See id.*, at 31. The technology in the Canrig case dealt with the use of a top drive motor to control the rotation of drill string whereas the '142 Patent concerns automatically increasing and decreasing the rate of release of drill string in response to changes in drilling fluid pressure. *Id.* Finally, NOV cites Wunder's deposition testimony wherein he agrees the specific technology at issue in the '142 Patent (i.e., increasing or decreasing the rate of release of drill string) was not at issue in the Canrig Litigation. *See* Wunder Depo., at 102:15–103:9.

The Court concludes the two representations are substantially similar. Both cases involve the same defendant opposing patent infringement claims related to the same control system with similar theories of liability and defenses. While the precise technology at issue may be different, the two patents exist in the same technological field. Moreover, the Court finds most compelling Wunder's own testimony in which he acknowledges he acquired the confidences of Omron officers

in preparing and sometimes presenting them for depositions in the Canrig Litigation, and those same witnesses have either been deposed or are scheduled to be deposed in this matter. Most telling of all is Wunder's stated reason for wanting to stay away from the NOV/Omron case: he possessed confidential information about Omron's employees and business operations based on his work in the Canrig Litigation.

### b.  Second Step: Effect of Wunder's Conflict on Raley & Bowick

Although the Court concludes the Canrig matter and this NOV lawsuit have a substantial relationship, and Wunder would be disqualified from representing NOV, the Court does not impute Wunder's conflict to the attorneys at Raley & Bowick for the same reasons articulated above in the Ground One section. The factual record is the same in that Wunder testified he never shared any confidences, the lawyers at Raley & Bowick swore they never received any confidences, and Wunder was separated from the NOV/Omron litigation. The equitable factors are largely the same. As for harm, Omron has the burden to describe with specificity the confidential information Wunder acquired in the Canrig Litigation and connect this knowledge to a particular harm Omron would suffer if Wunder disclosed it to Raley & Bowick. Based on the briefing and record, this burden remains unsatisfied, and while the Court can speculate as to potential prejudice, such guesswork would not be sufficient to disqualify Raley & Bowick in light of the harm NOV stands to suffer.

Consequently, the Court denies Omron's Ground Three as a basis for disqualification of the Raley & Bowick firm.

### Conclusion

Omron's motion to disqualify is premised on strict application of ethics rules and irrebuttable presumptions. These rules, however, serve only as guidance to this Court, and the controlling

authority—the Fifth Circuit—has not established the irrebuttable presumption Omron relies on for disqualification of the attorneys at Raley & Bowick.  After close examination of the facts and circumstances of this case along with equitable considerations, the Court determines disqualification would be too severe a remedy imposed on NOV especially when compared to the unidentified prejudice Omron will suffer if the Raley & Bowick firm remains on the case.

The timing of the motion also militates against disqualification.  Typically these motions are filed early in the litigation.  *See, e.g.*, *Am. Airlines*, 972 F.2d at 607–08 (motion filed within less than a month after the initial complaint); *Corrugated Container*, 659 F.2d at 1343–44 (motion filed during discovery).  When they are filed later in the litigation when discovery has all but ended and trial is near, courts are less inclined to grant them.  *See, e.g.*, *In re DataTreaury Corp.*, No. 06-CV-0072-DF (E.D. Tex. Dec. 30, 2009) (Order Denying Mot. Disqualify [#1814]) (motion filed almost four years after filing of complaint); *Carbo Ceramics, Inc. v. Norton-Alcoa Proppants*, 155 F.R.D. 158, 160–61 (N.D. Tex. Mar. 9, 1994) (motion filed when essentially all that remained was trial of the case).  While the late discovery of Wunder's employment with Raley & Bowick was not Omron's fault, the Court still hesitates to impose disqualification when essentially all that remains in this case, after two years of laborious litigation, is the trial, and Omron still cannot tell the Court the harm it has suffered or will incur.  In the Court's view, this motion was primarily motivated by tactics, which is Omron's right, but the Court cannot identify a substantial concern with confidence protection or prejudice prevention, which are two of the ethics rules' main purposes.  Yet it is the ethics rules Omron urges the Court to strictly follow with the goal of depriving Omron of its counsel at the last minute, lawyers who have represented this client on this patent for the last ten years.

At the same time, the Court does not view this motion as harassment or action worth

sanctions as NOV has boldly suggested in its briefing. *See* Pl.'s Resp. [#103-2], at 6 n.11. As this order demonstrates, Omron's motion has presented the Court with complicated questions of both law and fact and only after thorough consideration and reflection has the Court come to the conclusion disqualification is not appropriate in these circumstances.

Accordingly,

IT IS ORDERED that Defendant Omron Oilfield & Marine, Inc.'s Motion to Disqualify Counsel [#100] is DENIED.

SIGNED this the *14th* day of November 2014.

*Sam Sparks*
SAM SPARKS
UNITED STATES DISTRICT JUDGE