FILED
2015 AUG 28  PM 4: 33
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**NATIONAL OILWELL VARCO, L.P.,**
**Plaintiff,**

-vs-                                                                                 Case No. A-12-CA-773-SS

**OMRON OILFIELD & MARINE, INC.,**
**Defendant.**

## ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant Omron Oilfield & Marine, Inc. (Omron)'s Motion for Attorneys' Fees and Expenses [#187], Plaintiff National Oilwell Varco, L.P. (NOV)'s Response [#194], Omron's Reply [#201], NOV's Sur-Reply [#209], and Omron's Response to NOV's Sur-Reply [#204]; and Omron's Bill of Costs [#185], NOV's Objections [#192], and Omron's Notice Regarding Bill of Costs [#205]. Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders GRANTING IN PART and DENYING IN PART the motion.

### Background

The Court previously dismissed this patent lawsuit with prejudice for lack of standing. *See* Order of Feb. 17, 2015 [#179] (Dismissal Order).[1] Defendant Omron has now filed a motion for attorneys' fees under § 285 of the Patent Act, arguing this case is "exceptional." The lawsuit began on August 23, 2012, when Plaintiff NOV filed its complaint, asserting Omron had infringed NOV's

---

[1] In the lengthy Dismissal Order, the Court detailed much of the history of this case and NOV's litigation history with the '142 Patent in other cases. The Court relies on the Dismissal Order for purposes of the current order.

patent (the '142 Patent). *See* Compl. [#1]. The partes agreed to a stay of discovery until after the Court's *Markman* ruling. *See* Joint Discovery Plan [#16] at 2. After the parties worked through the *Markman* process, the Court issued its claim construction order on August 30, 2013, and days thereafter entered a scheduling order, setting the case for trial as soon as the Court's docket would allow: April 2015. *See* Orders of Aug. 30, 2013 and Sept. 5, 2013 [##54, 55].

As the parties entered the discovery phase, Omron sought proof of NOV's ownership of the '142 Patent. Omron was suspicious of NOV's ownership because of NOV's prior conduct in a number of different lawsuits that demonstrated a pattern of inconsistent positions taken by NOV regarding ownership. The Court discussed those prior lawsuits and NOV's various inconsistent positions in more detail in the Dismissal Order. *See* Dismissal Order at 5–6, 20–23. In particular, Omron was tipped off to a potential standing issue based on filings in a lawsuit asserted by NOV against Auto-Dril in the Eastern District of Texas (the Auto-Dril Case). *Id.* at 6.

In October 2011, Auto-Dril had filed a motion to dismiss based on NOV's failure to prove ownership of the '142 Patent. *Id.* In response, NOV asserted and relied upon a document titled "Assistant Secretary's Certificate," dated January 1, 2006. *Id.* That document reflected the Assistant Secretary of Varco, L.P.'s certification that Varco, L.P. had entered into an agreement to contribute all of its "physical assets" to NOV and that "[p]ursuant to the Asset Contribution Agreement," NOV obtained sole ownership of "the Property" of Varco, L.P. Def.'s Resp. [#140-9] Ex. 6 (Assistant Secretary's Certificate). Auto-Dril filed a reply arguing the certificate was insufficient to establish ownership of the '142 Patent because it merely indicates a transfer of "physical assets," not intellectual property. *See* Dismissal Order at 6. On the same day as Auto-Dril's reply, however, the

parties filed a joint motion to dismiss the action, citing a confidential settlement agreement signed the day before. *Id.*

In October 2013 as discovery began, Omron issued an interrogatory regarding standing. NOV responded on November 18, 2013, stating that on January 1, 2006, NOV purchased the '142 Patent from Varco, L.P. *See* Mot. Dismiss [#67-6] Ex. 5 (NOV's objections and answers to Omron's interrogatories) at 2, 11. NOV further stated: "Documents sufficient to substantiate these transactions will be produced including asset purchase agreements and assignment documents." *Id.* at 11. On February 26, 2014, counsel for Omron sent an email to counsel for NOV stating: "We have not seen the assignment from Varco, L.P. to National Oilwell Varco, L.P." *Id.* [#67-7] Ex. 6 (emails between counsel) at 6. Counsel for NOV responded: "This should have been produced as an exhibit to one of the NOV v. Auto-Dril filings (where Auto-Dril tried to contest standing)." *Id.* On March 9, 2014, counsel for Omron emailed counsel for NOV, informing him she had reviewed the Auto-Dril docket and only been able to locate the Assistant Secretary's Certificate. *Id.* at 2. She further stated that while the Assistant Secretary's Certificate was not an assignment or transfer document itself, it referenced an "Asset Contribution Agreement" between Varco, L.P. and NOV, L.P. dated January 1, 2006. *Id.* Finally, she noted the Asset Contribution Agreement (ACA) was not filed with the court in the Auto-Dril Case, and she asked counsel: "Would you please produce it ASAP?" *Id.* On March 17, 2014, NOV's counsel refused to produce a copy of the ACA, stating:

> The document is not relevant to any claim or defense in this lawsuit. The Secretary's Certificate shows that all assets of Varco, L.P. were sold to National Oilwell including the '142 Patent. The Asset Contribution Agreement would be cumulative and is not needed.

*Id.*

Dissatisfied with this position, Omron filed a Motion to Dismiss for Lack of Standing or, in the Alternative, Motion for Summary Judgment on April 25, 2014. *See* Mot. Dismiss [#67]. Like Auto-Dril, Omron thought the Assistant Secretary's Certificate was deficient in that it was not an actual assignment, and it only assigned "physical assets." *Id.* Omron also pointed out that NOV had refused to produce the ACA and that NOV's standing position was inconsistent with positions it had previously taken in prior lawsuits. *Id.* In its response from May 9, 2014, NOV—for the first time—produced the ACA, which is the actual document NOV claims transferred the '142 Patent from Varco, L.P. to NOV. *See* Resp. [#68]. On May 23, 2014, Omron replied and objected to the late disclosure of the ACA while also contending it too was insufficient to establish NOV's ownership of the patent. *See* Reply [#77]. On May 29, 2014, the Court denied the motion to dismiss without prejudice to refiling at a later date "as it appears that there are factual issues raised that must be determined by the fact finder." Order of May 29, 2014 [#78].

After the parties completed discovery, Omron renewed the motion to dismiss for lack of standing on December 4, 2014. Omron also moved for summary judgment, arguing that the '142 Patent was invalid based on a prior public use and that there was no infringement. The Court granted Omron's motion to dismiss for lack of standing. As an initial matter, the Court established the applicable legal standard, which placed the burden on NOV to demonstrate it owned the '142 Patent through a valid written assignment prior to initiating the lawsuit. *See* Dismissal Order at 7–8. While NOV offered a variety of extrinsic documents and evidence, the Court focused its attention on the ACA, "the only document which could even be considered a written assignment." *Id.* at 8. Next, the Court found the ACA failed to serve as a written assignment of the '142 Patent on three independent grounds. First, the ACA was not a present assignment of assets. *Id.* at 10–12. Second,

if the ACA were a present assignment, the ACA only transferred "physical assets," and the '142 Patent is not a "physical asset." *Id.* at 13–14. Third, even if the ACA were a present assignment and the '142 Patent were a "physical asset," the ACA simply did not transfer the '142 Patent. *Id.* at 14–17. The Court further noted the competing extrinsic evidence provided a mixed record on ownership of the '142 Patent. *Id.* at 17–19. Because NOV failed to meet its burden to prove ownership, the Court dismissed the case and did so with prejudice, finding it was plainly unlikely NOV would be able to cure its standing problem. *Id.* at 19–23. Finally, in the alternative, the Court found Omron was entitled to summary judgment on both invalidity and non-infringement grounds. *Id.* at 23–46.

Currently before the Court is Omron's motion for attorneys' fees. Omron first argues NOV knew or should have known this lawsuit was baseless the day it was filed in August 2012 because of the standing issue. Omron further contends NOV's failure to disclose the ACA earlier and its misrepresentations regarding the ACA unnecessarily extended this lawsuit through the completion of fact and expert discovery and summary judgment briefing. Second, Omron argues NOV should have known its infringement claim lacked merit both before it filed suit and especially after the Court entered its *Markman* order.

## Analysis

### I.   Legal Standard—Attorneys' Fees

Section 285 of the Patent Act authorizes a district court to award attorneys' fees in patent litigation. It provides, in its entirety, that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Supreme Court recently changed the standard for what it means for a case to be "exceptional" in *Octane Fitness, LLC v. ICON Health &*

*Fitness, Inc.*, 134 S. Ct. 1749 (2014). The previously prevailing standard originated in *Brooks Furniture Manufacturing, Inc. v. Dutailier International, Inc.*, 393 F.3d 1378 (2005), in which the Federal Circuit held "[a] case may be deemed exceptional" under § 285 in only two limited circumstances: "when there has been some material inappropriate conduct," or when the litigation is both "brought in subjective bad faith" and "objectively baseless." *Id.* at 1381. The *Octane Fitness* Court, however, held the *Brooks Furniture* standard was inconsistent with the statutory text. *Octane Fitness*, 134 S. Ct. at 1752–53. Specifically, the Supreme Court found "[t]he framework established by the Federal Circuit in *Brooks Furniture* is unduly rigid, and it impermissibly encumbers the statutory grant of discretion to district courts." *Id.* at 1755.

> In place of the *Brooks Furniture* standard, the Supreme Court held:
>
> [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Id.* at 1756.

In addition, the Supreme Court also rejected the Federal Circuit's requirement that entitlement to fees be established by clear and convincing evidence. *Id.* at 1758. Instead, the Court held "Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden . . . ." *Id.* (suggesting a preponderance-of-the-evidence standard to be appropriate).[2]

---

[2] NOV argues, notwithstanding *Octane Fitness*'s straightforward rejection of the *Brooks Furniture* standard, "the prior law relating to grounds for an exceptional case is still intact." Resp. [#194] at 8. As such, NOV argues "Omron cannot prove a case dismissed for lack of standing is 'exceptional' under § 285 without a showing of 'bad faith.'" *Id.* NOV is wrong, and *Octane Fitness* could not be more clear: an exceptional case is one that either "stands out from others with respect to the substantive strength of a party's litigating position," or because of "the unreasonable manner in which the case was litigated." Courts make that determination within their discretion based on the totality of the circumstances.
In its sur-reply, NOV continues to misinterpret *Octane Fitness* by arguing the Court "can only analyze the

## II.    Application

For purposes of § 285, the Court finds the case "exceptional" because of NOV's refusal to produce the ACA when Omron specifically requested the document and NOV's maintaining of this lawsuit once it was clear NOV lacked standing.[3]

Omron's first ground for attorneys' fees centers on the idea that NOV should have known, especially in light of the motion to dismiss filed in the Auto-Dril Case, that there was a standing issue. As such, Omron's position is NOV never should have filed suit without at least correcting the ownership problem. The Court agrees NOV was on notice of the standing issue prior to filing suit given the Auto-Dril Case. Yet while the Court could speculate[4] as to why NOV declined to correct any standing issues it had, the reality is the Court does not know the extent to which NOV was aware of the deficiencies in the paperwork supposedly evidencing the transfer of the '142 Patent from

---

'subjective bad faith' prong of *Octane Fitness* in deciding whether a standing dismissal made the case exceptional." Sur-Reply [#209] at 2. NOV arrives at this conclusion by first citing *Octane Fitness*'s statement that "either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* NOV then argues that because a ruling on standing is procedural and does not relate to the "merits" of a case, the Court can only consider the "subjective bad faith" prong.

     NOV's argument is frivolous. There is no "subjective bad faith prong" to *Octane Fitness*. The language NOV cites from *Octane Fitness* is the Supreme Court explaining why the second category of cases permitting fee awards under the previous *Brooks Furniture* standard (i.e., that a case be *both* brought in bad faith *and* exceptionally meritless) was inadequate as a measure of "exceptionality," because a case could be exceptional *either* because it was brought in subjective bad faith *or* because it was exceptionally meritless. *Octane Fitness*, 134 S. Ct. at 1757. The Supreme Court rejected the *Brooks Furniture* approach altogether and replaced it with the standard cited above. *Octane Fitness* could not be easier to understand.

[3] The Court has reviewed the record in this case and the parties' briefing. After consideration, the Court does not consider the case "exceptional" under § 285 based on the infringement dispute, which is Omron's second ground for attorneys' fees. While the Court ultimately (in the alternative) rejected NOV's infringement position and while that position certainly was largely undercut by the Court's *Markman* order announced in August 2013, the Court does not consider the parties' infringement dispute out of line with the many other patent cases this Court regularly handles.

[4] Omron has suggested on multiple occasions that NOV declined to correct the standing issue, even after having the issue brought to its attention, because of the implications such action would have had on previously filed lawsuits and resulting judgments. In particular, Omron argues such action would have undermined NOV's lost profits theory in the Pason Case. *See* Reply [#201] at 10–11. The record on this argument is undeveloped, and the Court declines to speculate on that motive.

Varco, L.P. to NOV prior to filing this lawsuit. In the Auto-Dril Case, NOV only produced the Assistant Secretary's Certificate, and the ACA was not produced. The Court does not know why it was not produced nor did the presiding court have an opportunity to rule on Auto-Dril's motion to dismiss. Giving NOV the benefit of the doubt on this point, the Court can see why it was reasonable for NOV to believe it could file a lawsuit as the owner of the '142 Patent considering it settled the lawsuit with Auto-Dril as the owner of the '142 Patent.

That inference is further supported by extrinsic evidence NOV presents reflecting its belief that it owned the '142 Patent. For instance, NOV presents: (1) testimony from individuals from both Varco, L.P. and NOV stating their belief and understanding that the NOV acquired the '142 Patent; (2) a memo created by an independent consulting company weeks before the transfer stating that the purpose of the transaction between Varco, L.P. and NOV was to transfer "all domestic assets"; and (3) a list of steps NOV has taken since the ACA reflecting its belief it owns the '142 Patent, including tax returns, licenses, and lawsuits predicated on ownership of the '142 Patent. *See* Resp. [#194] at 9–10 (citing to the record). In other words, it is plausible NOV believed it owned the '142 Patent when it sued Omron in August 2012.[5] As such, the Court does not consider NOV's filing of the lawsuit in the first place to be "exceptional."

---

[5] To be clear, the Court does not consider NOV's arguments about its "belief" and the extrinsic evidence it cites reflecting that "belief" to be relevant to this Court's determination that NOV failed to prove it had standing to bring the lawsuit. The law is clear that patent assignments must be in writing, and NOV had the burden to prove it owned the '142 Patent through a valid written assignment. NOV failed to carry its burden, and that conclusion was the extent of the Court's determination. In other words, the Court offered no conclusions regarding what entity actually owns the patent, and the Court did not find NOV is *not* the owner. The Court simply held NOV failed to meet its burden given the record presented. NOV's repeated cries concerning its "belief" do nothing to undermine this Court's Dismissal Order. *See* A FEW GOOD MEN (Columbia Pictures 1992) (Lieutenant Daniel Kaffee: "It doesn't matter what I believe! It only matters what I can prove!") (explaining to co-counsel Lieutenant–Commander JoAnne Galloway the disconnect between her "dreamworld" and legal reality).

The case, however, became exceptional when, through the course of discovery, NOV intentionally withheld the ACA. Omron first issued its interrogatory regarding standing in October 2013, and NOV responded it would produce "asset purchase agreements and assignment documents" evidencing NOV's purchase of the '142 Patent from Varco, L.P. When NOV failed to produce that discovery, Omron, on February 26, 2014, informed NOV it had "not seen the assignment from" Varco, L.P. to NOV. NOV's counsel responded the assignment should have been produced as part of the Auto-Dril Case, yet NOV only produced the Assistant Secretary's Certificate in the Auto-Dril Case. Omron's counsel told NOV's counsel that fact, explained why the Assistant Secretary's Certificate was deficient as a written assignment, and explicitly requested the "Asset Contribution Agreement" referenced by the Assistant Secretary's Certificate which was not produced in the Auto-Dril Case. On March 17, 2014, NOV's counsel refused to produce the ACA, called it "not relevant to any claim or defense in this lawsuit," claimed the Assistant Secretary's Certificate shows that "all assets" of Varco L.P. were sold to NOV, and stated the ACA "would be cumulative and is not needed."

That refusal to produce the ACA was exceptionally unreasonable. In direct response to NOV's refusal, Omron filed a motion to dismiss for lack of standing or, in the alternative, motion for summary judgment. NOV's response was first to continue to rely on the Assistant Secretary's Certificate as "the last link in [the] chain of title showing the sale of all assets from Varco, L.P. to NOV." Resp. [#68] at 4. Offering the Assistant Secretary's Certificate, a one-page document that is tangential to the underlying transaction, as if it were the actual document assigning millions of dollars worth of assets, including the '142 Patent, was disingenuous. In fact, the Certificate specifically references the ACA as the document pursuant to which NOV obtained ownership of the

relevant assets. Yet NOV offered the ACA in its response (finally and for the first time) as "further insurmountable evidence of its ownership of the '142 Patent" when, if anything, the Assistant Secretary's Certificate was "further" evidence of the ACA. *Id.* at 5. Moreover, to proclaim the ACA as "insurmountable" evidence of ownership when NOV's counsel two months prior refused to produce the ACA, calling it "not relevant to any claim or defense in this lawsuit," "cumulative," and "not needed" is untenable.

In addition, NOV's legal arguments and its evidence concerning the ACA offered in its initial response proved false. For example, NOV claimed the ACA transferred the '142 Patent because it "explicitly lists 'Patents' owned by Varco, L.P. as part of the physical assets that were transferred . . . ." *Id.* at 5. Yet only a few months later, NOV's Rule 30(b)(6) designee on standing testified he did not know which patents are referenced in the ACA. *See* Dismissal Order at 15 (citing the relevant portions of the record). As yet another example, NOV attached an affidavit from its in-house attorney stating "[t]he attached 'Asset Contribution Agreement' conveyed all ownership rights in United States Patent No. 5,474,142 to NOV." Resp. [#69-2] Ex. B (Creaven Aff.). That same attorney, however, represented to the Patent & Trademark Office in 2009—three years after the ACA in 2006—that Varco, L.P. owned the patent. *See* Mot. Dismiss [#130-9] Ex. 9.[6]

---

[6] NOV attempts to explain their lawyer's decision to make this representation to the PTO by providing an affidavit from that lawyer. *See* Resp. [#194-1] Ex. A (Creaven Decl.) ¶¶ 52–54. The lawyer's explanation is curious to say the least. Although not entirely clear, his position is that the PTO requires documentary evidence of a chain of title of a patent, and assignees must file assignments that list patents by their number. *Id.* ¶¶ 52–53. According to the lawyer, because the ACA did not specifically list the '142 Patent, as required by regulations, he could not record the assignment of the patent to NOV that purportedly occurred in 2006. *Id.* Instead, in 2009, he filed the 2004 assignment of the '142 Patent from Wildcat Services, L.P. to Varco, L.P. *Id.* That was the last assignment on record with the PTO as of the filing of this lawsuit. In other words, NOV's lawyer filed an assignment with the PTO in 2009 indicating Varco, L.P. was the owner of the patent when he was under the belief NOV owned the patent. There is no indication NOV took any steps subsequent to that filing to update the PTO registry with documentary evidence of the assignment to NOV. Notably, NOV's lawyer openly states he did not file the ACA with the PTO because it was inadequate to show the '142 Patent had been transferred to NOV. If anything, this explanation strongly suggests NOV was aware of the problems with the ACA as early as 2009. Yet NOV did nothing to correct the issues with the assignment paperwork, and NOV

When in December 2014 Omron renewed its motion to dismiss for lack of standing after the Court denied the first motion without prejudice to refiling, Omron's arguments focused on the ACA. NOV's response contained remarkably weak legal arguments. *See* Resp. [#140-2] at 2–9. First, NOV argued Omron lacked standing to challenge the meaning of the ACA, an argument roundly rejected by the Court. *See* Dismissal Order at 7 n.2. Next, NOV argued the language of the ACA was "unambiguous" by reciting the relevant language of the ACA and then summarily asserting "[t]he parties made a *concurrent* agreement to convey *all* property from one company to another" and "[t]he ACA transferred all assets of Varco to NOV, including the '142 Patent." Resp. [#140-2]. The ACA language NOV had just quoted, however, did not unambiguously do what NOV claimed; NOV's characterizations of the ACA reflect, at best, willful ignorance. The ACA was unambiguous in that (1) it was not a present assignment, (2) it only referred to "physical assets", and (3) the '142 Patent was not included in any supposed transfer. Considering the ACA totally undermined its position, NOV attempted to distract the Court with extrinsic evidence but to no avail under the controlling law. In sum, NOV offered no credible arguments to rebut Omron's grounds for dismissal, and the Court ultimately—in what was not a close call—accepted essentially all of Omron's arguments regarding lack of standing. *See* Dismissal Order at 3–23.

*Octane Fitness* instructs courts, within their discretion and based on the totality of the circumstances, to award attorneys' fees when a case stands out from others with respect to the substantive strength of a party's litigating position or the unreasonable manner in which the case was litigated. Having considered the full record of this litigation, which has now lasted three years, the

---

proceeded to file lawsuits as the owner of the '142 Patent. While the undersigned is no longer paid to dispense legal advice, the Court would offer NOV the following free of charge: quit while you're behind.

Court concludes this case stands out from the many other patent cases this Court handles in both of these respects. NOV was on notice before it even filed suit that there was at least a potential issue involving standing, yet it proceeded to sue Omron nonetheless. When Omron sought discovery on NOV's ownership, NOV was not forthcoming, and when Omron specifically requested the critical document, the ACA, NOV intentionally withheld it as "not relevant to any claim or defense in this lawsuit." The ACA could not have been more relevant as it proved critical to the case and ultimately was the basis for dismissal of the lawsuit. The Court is hard-pressed to come up with any reasons why NOV would engage in this sort of behavior other than a desire to hide the standing issue from Omron and thereby prolong the litigation.

Moreover, NOV's arguments and evidence offered in response to Omron's first motion to dismiss were weak and unsupported. When given the chance to fully develop the record and arguments on Omron's renewed motion, NOV fared no better and actually made things worse. The Court had little choice but to dismiss the case. And, based largely on the litany of examples demonstrating the variety of inconsistent positions NOV had taken concerning ownership of the '142 Patent, the Court dismissed the case with prejudice as it was plainly unlikely NOV could cure its standing problem.

Therefore, the Court finds this case "exceptional" under § 285, authorizing the Court to award attorneys' fees to Omron.

### III. The Amount of Fees

The Fifth Circuit uses a two-step process to calculate attorneys' fees. *Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999). First, a court calculates a "lodestar" figure "by multiplying the number of hours reasonably expended by an appropriate hourly rate in the

community for such work." *Id.* In so doing, the court considers whether the attorneys demonstrated proper billing judgment by "writing off unproductive, excessive, or redundant hours." *Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 769 (5th Cir. 1996). The plaintiff has the burden of showing the reasonableness of the hours billed and proving the exercise of billing judgment. *Id.* at 770. After calculating the lodestar, the court may increase or decrease it based on the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989). *Heidtman*, 171 F.3d at 1043. Those factors are: (1) the time and labor required by the litigation; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) the award in similar cases. *Id.* at 1043 n.5 (citing *Johnson*, 488 F.2d at 717–19).

Omron requests a total amount of fees and expenses of $2,045,126.02. *See* Dodd Decl. [#188-1] Ex. 1. Omron has, alternatively, offered its requested fees and expenses dating from August 30, 2013, the date of the *Markman* order, and March 17, 2014, the day NOV's counsel refused to produce the ACA. As explained above, the Court finds this case exceptional based on NOV's decision to withhold the ACA and its decision to maintain this lawsuit despite weak legal footing. As such, the Court finds NOV should be held responsible for Omron's fees and expenses incurred after March 17, 2014.

Omron's requested amount of fees and expenses for the period after March 17, 2014, is $1,356,916.96. *Id.* That figure includes: (1) $954,082.50 billed to the law firm Foley & Lardner LLP; (2) $67,532.00 billed to the law firm Graves Dougherty Hearon & Moody (GDHM); (3) $259,722.71 in expert fees; and (4) $75,579.75 in "other litigation expenses." *Id.*

First, the Court considers the fees of Foley & Lardner and GDHM, which cumulatively total $1,021,614.50. As an initial matter, NOV makes no objections to the hourly rates used by Foley & Lardner and GDHM. Instead, NOV focuses on the number of hours billed. *See* Resp. [#194] at 16–18. As such, the Court accepts the hourly rates used. Concerning the number of hours billed, NOV makes two objections: (1) it should not have to pay for billed time unrelated to the Court's Dismissal Order, and (2) it should not have to pay for any of Omron's losing arguments. *Id.* As an initial matter, much of the billed time NOV complains about predates March 17, 2014, and as such, NOV will not be ordered to pay those fees. *Id.* at 17. As for NOV's objections, the Court disagrees. As explained, NOV made this case exceptional beginning March 17, 2014, and the Court, within its discretion under § 285, decides to hold NOV accountable for Omron's attorneys' fees incurred after that date through the date of dismissal. Accordingly, the Court declines to parse Omron's requested fees based on whether they related directly to the Court's Dismissal Order or whether Omron prevailed on the particular argument.

Beyond those two objections, NOV simply complains Omron's billed time is too high and compares Omron's request to fee awards in other patent cases. *See id.* at 18–20. NOV, however, offers no specificity with respect to Omron's time sheets and how Omron could have billed less time. When the Court considers this case in light of the *Johnson* factors, it does not consider Omron's billed time to be unreasonable nor does it consider a fee award of $1,021,614.50 particularly high

for this sort of complex patent case. In fact, Omron has cited survey data from the American Intellectual Properly Law Association (AIPLA) which demonstrates its requested fees are actually lower than the average in patent cases with similar amounts at stake. *See* Mot. Attorneys' Fees [#187] at 10–11. NOV does not dispute this argument, and in fact, NOV has relied on this same survey data in a separate lawsuit wherein NOV is seeking an award of attorneys' fees under § 285. *See* Dodd Decl. [#188-1] Ex. 9 (NOV's Motion for Attoneys' Fees at 27 in the *Tesco* case). In addition, the amount of time Omron's lawyers spent defending this case was reasonable in light of the fact NOV was seeking damages over $18 million. *See* Dodd Decl. [#188-1] Ex. 8 (NOV's Settlement Demand). Because NOV was seeking treble damages under 35 U.S.C. § 284, Omron was exposed to liability of more than $54 million. *Id.* The difficulty of the issues involved was high and required commensurate legal skill. The lawyers involved for Foley & Lardner and GDHM have substantial experience in patent litigation, and the requested fees are customary for legal services of this nature. *See id.* Ex. 5 (attorney bios for Foley & Lardner attorneys); Powers Decl. [#188-2] at 1–2 (providing links to attorney bios for GDHM). Moreover, the Court observes these lawyers demonstrated their high level of skill and expertise throughout this litigation and ultimately achieved a very favorable outcome for their client. Finally, awards in similar cases have been in the range of fees Omron has requested, some more and some less as illustrated by the cases cited by the parties in their respective briefs.

    Second, expert fees are not recoverable under § 285 although "[a] district court has inherent authority 'to impose sanctions in the form of reasonable expert fees in excess of what is provided by statute.'" *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921 (Fed. Cir. 2012) (quoting *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008)). "Use of this

inherent authority is reserved for cases where the district court makes a 'finding of fraud or bad faith whereby the very temple of justice has been defiled.'" *Id.* (quoting *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed. Cir. 1994) (internal quotation omitted)). "Accordingly, not every case that qualifies as exceptional under § 285 will also qualify for sanctions under the court's inherent power." *Id.* The Court elects not to exercise its inherent authority to impose sanctions in the form of Omron's expert fees. Section 285 and the award of attorneys' fees is adequate for the circumstances of this case. As such, the Court does not hold NOV responsible for Omron's expert fees and reduces Omron's requested award by $259,722.71.

Finally, Omron requests $75,579.75 in "other litigation expenses." While unclear, these expenses apparently are for "disbursements, non-legal personnel, and paralegal personnel." Mot. Attorneys' Fees [#187] at 9 n.1. The Federal Circuit has held an award under § 285 may include such expenses. *Cent. Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983). The Court declines to award Omron any of its "other litigation expenses," and instead focuses on attorneys' fees as outlined above. Therefore, the Court reduces Omron's request by $75,579.75.

In sum, the Court awards attorneys' fees to Omron in the amount of $1,021,614.50.

## IV. Bill of Costs

Omron has filed a Bill of Costs requesting a total of $65,488.23. *See* Bill of Costs [#185]. NOV filed Objections, requesting the Court reduce Omron's Bill of Costs "by $15,328.42 (plus whatever portion of the remaining $3,673.58 in printing costs the court finds were not necessary for litigating this case and were merely for the convenience of counsel)." Objections [#192]. In response to these objections, Omron filed a notice with the Court stating: "Although Omron disagrees with NOV's arguments, Omron agrees to reduce its request by the $19,002 NOV

complains about in an effort to reduce the burden on the Court in resolving these issues." Notice Regarding Bill of Costs [#205]. As such, Omron requests $46,486.23 ($65,488.23 - $19,002) in taxable costs. *Id.* Seeing no reason to disagree with the parties' understanding, the Court permits costs to Omron in the amount of $46,486.23.

## Conclusion

Accordingly,

IT IS ORDERED that Defendant Omron Oilfield & Marine, Inc.'s Motion for Attorneys' Fees and Expenses [#187] is GRANTED IN PART and DENIED IN PART as described in this opinion;

IT IS FURTHER ORDERED that Defendant Omron Oilfield & Marine, Inc. does have and recover attorneys' fees against Plaintiff National Oilwell Varco, L.P. in the amount of ONE MILLION, TWENTY-ONE THOUSAND, SIX-HUNDRED FOURTEEN DOLLARS AND FIFTY CENTS ($1,021,614.50), for which let execution issue; and

IT IS FINALLY ORDERED that the Clerk SHALL assess costs of suit against Plaintiff National Oilwell Varco, L.P. in the total amount of FORTY-SIX THOUSAND, FOUR HUNDRED EIGHTY-SIX DOLLARS AND TWENTY-THREE CENTS ($46,486.23), as agreed to by the parties.

SIGNED this the 28th day of August 2015.

*/s/ Sam Sparks*
SAM SPARKS
UNITED STATES DISTRICT JUDGE